**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wilfredo BONILLA–COMACHO,**
**Defendant–Appellant.**

**No. 96–4099.**

United States Court of Appeals,
Seventh Circuit.

Argued May 15, 1997.

Decided July 30, 1997.

Monica Rimai (argued), Pamela Pepper, Office of the United States Attorney, Milwaukee, WI, for plaintiff–appellee.

Gary Sternberg (argued), Sternberg & Associates, Chicago, IL, for defendant–appellant.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

What really happened at a Hardee's fast-food restaurant outside Kenosha, Wisconsin, on a hot August day a few years ago? Was Wilfredo Bonilla–Comacho just one of the honest, hardworking folks at the restaurant hoping to enjoy a burger and fries? or was he part of a band of drug dealers (unknowingly infiltrated by a couple of double-crossers) bent on doing a multi-kilo cocaine transaction? The jury thought he wasn't at Hardee's to do lunch, so we consider today his appeal, which followed his conviction for conspiracy to attempt to possess cocaine with intent to distribute (21 U.S.C. §§ 841(a)(1)

and 846) and using and carrying a firearm during a drug trafficking crime (18 U.S.C. § 924(c)(1)). Because Bonilla was convicted, we'll start with the government's version of the facts.

The story began when Edwin Cruz hooked up with a fellow named Jose Lozano in the Humboldt Park area of Chicago. Cruz let on that he was in the market to buy, as a "middleman," a bit of cocaine from Lozano. This was not a very smart move because Lozano, it turned out, was doing work for the federal Drug Enforcement Administration as a confidential informant. At a second meeting, Lozano told Cruz that the negotiations—and the deal-would take place in Kenosha, 50 or so miles north of Chicago just beyond the Illinois–Wisconsin border.

A few days later, Cruz and Lozano drove to a Hardee's in Kenosha, where they met with Jose Chamorro, an undercover Illinois State Police special agent who pretended he was Lozano's supplier. The three then went to a room at the Knight's Inn motel—which the cops had rigged with a hidden video camera—and discussed the deal. Cruz expressed interest in eventually purchasing up to 15 kilos of cocaine. As the men talked, a DEA agent, undercover of course, arrived with a duffel bag containing 11 kilos of cocaine. Cruz checked the dope and took a small sample back to Chicago.

Later that day Cruz called Lozano and said "his people" did not have enough money for the entire 11 kilos but that they could buy 3 kilos the next day for $20,000 each. Cruz said he would have enough money to purchase the other kilos in a short while. After checking with his law enforcement contacts, Lozano okayed the 3–kilo deal.

The next day, Cruz, Lozano, and Officer Chamorro again met at the Kenosha Hardee's. After letting Chamorro know he was ready to do the deal, Cruz went to the parking lot on the west side of the restaurant and met with several men, including Bonilla. Cruz then returned to the restaurant and took Chamorro to the east parking lot where Rocco D'Ambrosio, whom Cruz called the "money man," was sitting in a jet black Corvette. D'Ambrosio handed Chamorro a brown paper bag containing bundles of mon-

ey. Chamorro glanced at the cash and said it didn't add up to 60 G's. After thumbing through the bills, Chamorro announced they were $20,000 short.

Cruz and Chamorro returned to the restaurant to speak with Lozano. They were joined by Bonilla and another of Cruz's companions, Anselmo (or perhaps Enselmo) Echevarria. Although Cruz skipped the niceties of proper introductions, he did tell Chamorro "[t]hey are with me" and "[t]hey are buying a kilogram". Affecting a disgusted attitude, Chamorro reiterated that $20,000 was missing and the deal was off until all the cash was in place. Cruz interposed that "his people" had the rest of the money, at which point Echevarria and Bonilla each confirmed that they had the rest of the dough by gesturing toward their chests or waists.

Chamorro told Cruz, Echevarria, and Bonilla to go into the Hardee's bathroom and get all the cash in Cruz's hands, which they did. Then, back at the Corvette, Cruz added several white mailing envelopes to the bag of money. Opening a few random envelopes, Chamorro counted about $1,000 in each. Adding the amount estimated to be in the envelopes to his prior calculation, Chamorro announced that Cruz and his companions were still about a grand short.

While discussing the money, Officer Chamorro also told Cruz, Echevarria, and Bonilla that he had 10 more kilos of cocaine to sell and asked if they would be able to do a second transaction. Cruz said he would need a few days before considering another purchase. Bonilla said he was interested in one of the kilos. Echevarria or Cruz stated they could easily sell up to 10 kilos in the Humboldt Park area.

At this point D'Ambrosio threw in the remainder of the money needed to close the 3–kilo deal, saying "Wilfredo owes me a thousand." Chamorro, satisfied that the cash was at hand, walked away from the Corvette, gave the high sign, and a bevy of cops—in riot gear with guns drawn—closed in for the kill.

Bonilla took off running but was stopped and ordered to the ground by a Kenosha police detective. The detective patted Bonil-

la down and found a loaded .357 caliber Smith & Wesson revolver tucked in the rear waistband of his pants. According to an agent from the Bureau of Alcohol, Tobacco and Firearms who watched the deal unfold, the agents surveilling the transaction guessed, based on "the way Mr. Bonilla was posturing himself and the way he was positioning himself in the deal[,] that if anyone was carrying the gun, he would be the individual.... [A]ll of us pretty much felt that he was there for protection."

From the Corvette the officers recovered $67,100 in a brown paper bag, with some of the money in 17 white envelopes. A fingerprint analyst lifted 10 prints from the envelopes. Two belonged to Cruz and one to Bonilla.

So now you've heard the government's version of what happened at the Hardee's. Here's Bonilla's tale, which the jury apparently thought was a fish story.

According to Bonilla, he, his wife, and her nephew drove to the 7–Mile Fair, a flea market near Racine, Wisconsin, 20 or so miles north of Kenosha. The market was closed so they turned around and headed back to Chicago, stopping at the Hardee's in Kenosha to have lunch. While there, Bonilla saw a Latino man (who turned out to be Echevarria) who looked familiar. Bonilla went to speak to the man, and although it turned out Bonilla did not know Echevarria, the two chatted and Echevarria said he knew Bonilla's family back in Puerto Rico. Bonilla then went to use the men's room, and as he was exiting (while pulling up his zipper), he passed Echevarria, who by then was with a fat man (Cruz). Bonilla followed Echevarria and the fat man out of the restaurant in order to say goodbye to Echevarria when suddenly a van pulled up and a bunch of people got out and began "running around with guns." This caused Bonilla, who says he has a nervous disorder, to "go crazy" and take off. Said Bonilla: "I ran because I thought—because I thought they were robbers and I don't know. My nerves just got really over-reactive, and what I had was more like a shock." He said he was thrown to the ground by four or five officers, one of whom then pressed his back and said "look

what I found," referring to a gun Bonilla had never seen before. To explain his fingerprint on a money envelope, Bonilla testified that after the arrest, while he was being processed at the Drug Enforcement Administration's Milwaukee field office, DEA Agent Ray Melick came up to him with an envelope, handed it to him, and asked if it was his. Bonilla took the envelope in his hands, said it wasn't his, and returned it. Further, said Bonilla, another officer then came up to Melick with the gun and asked what should be done with it. According to Bonilla, Melick responded that he was "going to put it on him," meaning Bonilla. Agent Melick, incidentally, testified that the incident with the envelope never happened and that he never even spoke with Bonilla at the field office after the arrest.

■ Bonilla's first claim is that a faulty jury instruction requires the setting aside of his § 924(c)(1) conviction. The statute penalizes a defendant who, "during and in relation to any ... drug trafficking crime ... uses or carries a firearm...." Joining a long list of appellants, Bonilla seeks relief in the wake of *Bailey v. United States*, 516 U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

Prior to *Bailey*, we broadly defined "use" under § 924(c)(1) to encompass mere possession of a firearm during a drug offense. *Bailey* narrowed the interpretation of "use" in § 924(c)(1) to "*active employment* of the firearm ..., a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at ——, 116 S.Ct. at 505. "Use" now calls for more than simple possession or placement of a gun to provide a sense of security or otherwise facilitate a drug offense. Instead, it requires things like "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at ——, —— U.S. at ——, 116 S.Ct. at 508. Although Bailey fine tuned the "use" prong of § 924(c), it didn't lay a finger on the "carrying" prong of the crime.

The application of *Bailey* to this appeal is curious in two respects. First, *Bailey* was decided on December 6, 1995, and Bonilla's trial began January 29, 1996. But everyone, it seems, was sleeping at the switch. The

effect of Bailey was never considered, notwithstanding the fact that it was almost 2 months old when this case went to the jury.

The second, and more important, reason why the present argument over *Bailey* on this appeal is curious is that *Bailey* doesn't have anything to do with this case from a practical point of view.

Lawyers and judges are obligated to give juries instructions that are comprehensible. The instructions should help jurors zero in on the real issues—usually factual questions—raised by the evidence. But here, the prosecutor submitted this instruction regarding § 924(c)(1):

> If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred, then there is a violation of the statute.

The defense didn't object to this proposed instruction and the judge read it to the jury.[1] The instruction, after *Bailey*, was dead wrong. It was also unnecessary. Consider the real issue in this case: Was Bonilla, while packing a gun, a player in the drug deal or simply someone who happened to be in the wrong place at the wrong time? The questioned instruction gave the jury no help in answering this question. So why bog the jury down with the nuances of things like "possession," "control," and "emboldening"? It would have been far better here to simply tell the jury that if it believed, beyond a reasonable doubt, that Bonilla had done the things attributed to him (like, for instance, saying that he could use a kilo of cocaine and that he carried a gun with him during the deal), it should find him guilty beyond a reasonable doubt. If, on the other hand, the jury had a reasonable doubt based on anything in the case, including but not limited to Bonilla's version of the facts, it should acquit.

That would have been a more sensible way to frame the real issue in the case for the jury.

So what we have here is an unnecessary instruction that, because it did not draw an objection, we review only for plain error. For Bonilla to come out on top on this claim we must find an error that seriously affected the "fairness, integrity or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. ——, ——, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997). Bonilla bears the burden of proof. *See United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) ("It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.").

Instead of beating too long around the bush, we'll get right to the point: Although the instruction was wrong, it did not "seriously affect the fairness" of the trial because, as we explained, the legal intricacies of § 924(c) were not at issue. As a matter of fact, the jury must have believed that Bonilla carried the gun during the drug deal, and that means no prejudice flowed from the bum instruction.

■ The remaining issues involve Bonilla's sentence. First, the district court attributed to Bonilla not only the 3 kilos that he, Cruz, Echevarria, and D'Ambrosio attempted to purchase, but also, over objection, the kilo Bonilla said he was interested in purchasing from Chamorro at a later time. Application note 12 to U.S.S.G. § 2D1.1 (as it read at the time of Bonilla's offense) indicates that negotiated quantities from an uncompleted drug transaction should be included for purposes of setting an offense level unless a defendant "did not intend to produce and was not reasonably capable of producing the negotiated amount. . . ." U.S.S.G. § 2D1.1, comment. (n.12) (Nov.1994). Although this note is phrased for the situation where the defendant sells drugs, we've held it applicable as well to reverse-sting operations like the one in this case. *United States v. Cotts*, 14 F.3d 300, 307 (7th Cir.1994). We have read the

---

1. Just prior to the giving of this instruction the judge properly instructed the jury on the statutory elements of § 924(c)(1).

condition to mean that "negotiated, undelivered drugs should be counted in determining the base offense level, as long there were true negotiations and not idle talk". *United States v. Garcia*, 69 F.3d 810, 820 (7th Cir. 1995).

As a result of the inclusion of the one negotiated kilo as part of his relevant conduct, Bonilla's offense level under U.S.S.G. § 2D1.1(c) increased from 28 (for offenses involving at least 2 but less than 3.5 kilos of cocaine) to 30 (at least 3.5 but less than 5 kilos of cocaine). According to Bonilla, though, the record "is devoid of any evidence suggesting that Bonilla was capable of, ready, or actually willing to purchase the additional kilo. There was no mention of time, place, price or quantity." In other words, he claims that his expressed interest in an additional kilo was mere braggadocio or idle talk, not a true request to be taken seriously. As a factual finding used to determine the appropriate sentencing range, the inclusion of the additional kilo is reviewed under the clearly erroneous standard—overturned only if we are left with the definite and firm conviction that a mistake has been committed. *Garcia*, 69 F.3d at 819.

Prior cases show the difference between what we have considered idle talk and true negotiation. In *United States v. Ruiz*, 932 F.2d 1174 (7th Cir.1991), the defendant told a buyer upset about a missing kilo of cocaine "I'll get you the other kilo. And, if you want, even ten more I can get." We held that the 10 kilos could not be included in determining Ruiz's sentence because there was no evidence of price or evidence that he had access to that amount. The single statement was mere puffery, not negotiation. On the other hand, in *United States v. Cedano–Rojas*, 999 F.2d 1175 (7th Cir.1993), the defendant, after learning the price of a kilo of cocaine, said he could "move" 10 kilos in 2 days and that 10 kilos "were under [his] control." During the reverse-buy transaction he actually purchased only one kilo and told the informant-supplier to save the other 9, stating "Don't give them away." We upheld using the 9 additional kilos for sentencing purposes because the statements indicated the defendant intended to buy them, and other evidence showed he had the ability to do so. In *Garcia, supra*, the defendant agreed to provide a government informant with 4 extra kilos of cocaine after receiving payment for 2 kilos already fronted. At the payment site the defendant was arrested after accepting payment for the prior 2 kilos, but did not have the additional 4 kilos on hand. We nevertheless included those 4 kilos in calculating the offense level because the agreement to provide them was more than an offhand statement and the defendant had the means to produce that amount.

The record shows that like the defendants in *Cedano* and *Garcia*, Bonilla had both an expressed intent to purchase an additional kilo and the ability to complete the transaction. Bonilla obviously had a serious interest in obtaining cocaine, and some of Cruz's acquisition was headed in Bonilla's direction. Nothing in Bonilla's statement indicates that he was bragging about something he could not accomplish or that he was trying to seem like a bigger drug operator than he really was. The offer of additional cocaine by Chamorro did not occur in jest but rather in the midst of a serious 3–kilo deal involving $60,-000. Bonilla points to absolutely no evidence indicating he did not intend to purchase another kilo.[2] Bonilla also demonstrated his ability to close a future deal for a kilo. He not only observed the Chamorro/Cruz transaction but in fact provided a good chunk of cash—several thousand dollars, it seems—for it. In addition, Bonilla's willingness to take another kilo matched the amount Cruz said Bonilla and Echevarria were getting from the Hardee's deal. In sum, nothing suggests he was blustering, and the record supports inclusion of the extra kilo in Bonilla's basket.

▮▮▮ Next, the district judge, over objection, increased Bonilla's base offense level by 2 pursuant to U.S.S.G. § 3C1.1 for "willfully

---

**2.** Effective with the guidelines amendments of November 1, 1995, application note 12 places on a defendant the burden of showing he did not have the intent or capability of purchasing the additional quantity. Under the version of the note in effect in August 1995, though, the government still bore the burden of proving intent and capability to provide or buy the negotiated amounts.

obstruct[ing] or imped[ing] ... the administration of justice during the ... prosecution," because the judge believed Bonilla lied on the stand, in particular regarding his claim that the gun was planted and he was framed. Committing perjury, of course, triggers the § 3C1.1 enhancement. U.S.S.G. § 3C1.1, comment. (n.3(b)); *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). For purposes of the guideline, perjury has the same definition as under the general federal perjury statute, 18 U.S.C. § 1621: false testimony concerning a material matter with the willful intent to provide false testimony, not merely incorrect testimony resulting from confusion, mistake, or a faulty memory. *Dunnigan,* 507 U.S. at 94, 113 S.Ct. at 1116; see 18 U.S.C. § 1621. In order for the district court to apply the § 3C1.1 enhancement, it had to "review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same." *Dunnigan,* 507 U.S. at 95, 113 S.Ct. at 1116. An obstruction enhancement will be upheld on appeal so long as the district court "makes a finding of obstruction of or impediment to justice that encompasses all of the factual predicates for a finding of perjury." *Id.; United States v. Buchannan,* 115 F.3d 445, 450 (7th Cir.1997).

■ Bonilla contends that the district court failed to make an independent determination of his perjury.[3] Whether a district court has met this requirement is a matter of law that we review *de novo.* But a district court's actual determination that a defendant obstructed justice by testifying falsely is a finding of fact entitled to deferential review under the clearly erroneous standard. *United States v. Brown,* 71 F.3d 1352, 1361 (7th Cir.1995).

■ At sentencing, the district judge said the facts at trial "suggest only one thing, and that is that the Defendant ... carried the gun in relationship to the offense." In a subsequent decision and order concerning the enhancement, the judge reiterated that statement and added: "[T]he Court found, independent of the jury's conclusion, that Bonilla-Comacho did not tell the truth when he explained away the presence of a gun on his person during the underlying arrest."

■ Because it was the sole basis of the § 924(c)(1) charge (and conviction), the gun's appearance at the scene, by itself, constitutes a material matter. The record here shows that the district court, separate from the jury, found Bonilla's testimony regarding the appearance of the gun false because he, in fact, was carrying it during the drug deal. The finding that Bonilla did not tell the truth regarding the gun encompasses the perjury element of willful intent to testify falsely. Therefore, the district court's statements constitute the independent findings necessary to uphold the enhancement. Just because the judge said he found the same thing to be true as did the jury on the same facts doesn't mean his opinion wasn't independent. Both judge and jury found the government's version of the events to be the truth and, as a result, it follows that Bonilla lied on the stand. The obstruction enhancement, based on the gun testimony alone, was proper.

Bonilla's conviction and sentence are

Affirmed.

■

---

3. Instead of pointing to *Dunnigan,* Bonilla argues that in order to apply the enhancement for perjury, the district court has to meet the standards set forth in *United States v. Lozoya–Morales,* 931 F.2d 1216, 1219–20 (7th Cir.1991): either (a) the district court must make an independent factual finding that a defendant committed perjury, or (b) the record must clearly demonstrate that the jury found such a falsehood; the enhancement cannot be given based entirely upon the jury's guilty verdict. To the extent that *Lozoya–Morales* affirmed sentencing enhancements merely on the basis of a verdict inconsistent with the defendant's testimony, it is no longer authoritative after *Dunnigan. See Buchannan,* 115 F.3d at 451. We will analyze Bonilla's sentence for compliance with *Dunnigan,* which Bonilla shouldn't mind since it is more favorable to him.