In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 07-1399 & 07-1778

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RODRIGO SOTO-PIEDRA and MIGUEL HERNANDEZ,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
Nos. 05 CR 156-009 & 05 CR 156-001—**Larry J. McKinney**, *Judge.*

———————

ARGUED MARCH 4, 2008—DECIDED MAY 5, 2008

———————

Before CUDAHY, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Rodrigo Soto-Piedra and Miguel Hernandez pleaded guilty to conspiracy to distribute cocaine. *See* 21 U.S.C. §§ 846, 841(a)(1). Neither stipulated to a precise drug quantity when pleading guilty, and each now challenges his sentence. Soto contends that the district court exaggerated the drug quantity by relying almost exclusively on an informant's estimate that the probation officer repeated in the presentence report. Hernandez maintains that the court overstated his base offense level on the mistaken assumption that he was

involved with crack rather than powder cocaine. We reject Soto's contention but agree with Hernandez that his case must be remanded.

## I. History

The underlying facts are brief. In March 2005 an informant, Susana Ramirez, told authorities that between April and December 2004 she purchased 5 to 7 kilograms of powder cocaine each week from Soto and his girlfriend at a price of about $20,000 per kilogram. The Drug Enforcement Administration then set up a controlled buy in which Ramirez asked to purchase one-half kilogram of cocaine from Soto and his girlfriend. The girlfriend obtained the cocaine from Vicente Camarena-Salazar[1] and delivered it to Ramirez. Where Camarena obtained the cocaine is unknown. After this transaction authorities conducted surveillance on telephones used by Camarena and Soto.

Two months later, in May 2005, Soto called Camarena to inquire about buying one kilogram of cocaine. There was no discussion about crack. Camarena replied that he would check with his supplier. He contacted Hernandez, who volunteered that he could supply cocaine that would give "almost everything back in return," roughly "ninety-five percent," if Camarena's customer

---

[1] Camarena also pleaded guilty to conspiracy to distribute cocaine and subsequently appealed, but his appointed lawyer moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967). We have issued a separate order granting that motion and dismissing Camarena's appeal. *See United States v. Camarena-Salazar*, No. 07-1012 (7th Cir. May 5, 2008) (unpublished order).

wanted the cocaine "for cooking." (A DEA agent testified at Soto's change-of-plea hearing that "cooking" means converting powder cocaine into crack and that 95% refers to the relative weight of the crack after the "cooking" process.) Camarena relayed this information to Soto, who did not say what he planned to do with the powder cocaine. After that Camarena continued to negotiate with Hernandez, though there was no more discussion about "cooking" or "return." At first Hernandez was reluctant to front the drugs as Camarena proposed, but Camarena assured him that Soto was reliable and in the past year had gotten "out up to five a week." But then the discussions ended with Hernandez telling Camarena that the deal was not "for sure." Hernandez did not think he could obtain any cocaine, and if he could it would be expensive. As far as this record shows, the deal never went through.

In late May, Camarena contacted Hernandez again on behalf of a different customer. Hernandez again boasted that he could supply powder cocaine that is "good for the kitchen" and "gives almost everything back" when converted to crack. This time Camarena responded that his customer indeed wanted something that "works well for the barbeque." Hernandez, however, had none of this high-quality cocaine in stock. Camarena was not interested in buying lesser-quality cocaine, and the conversation ended with Hernandez promising to call when some of higher quality became available.

Another week passed before Hernandez called Camarena on June 3, 2005, to ask how many "karats" he wanted. (The DEA agent testified that "karats" meant kilograms of powder cocaine.) Camarena told Hernandez that one customer wanted 10 kilograms and another wanted 5.

During this conversation, however, nothing was said about "cooking" or return or percentage or anything else indicating that Hernandez was offering to supply cocaine suitable for converting into crack, and the government directs us to no evidence suggesting that either of these two customers was the one who a week earlier wanted cocaine "for the barbeque." Hernandez ended the conversation by confirming that he could tell his supplier that it would be, "fourteen, fifteen karats." A few days later, DEA agents followed Hernandez as he drove from Lafayette, Indiana, to Chicago. The agents stopped Hernandez after he left Chicago and seized 1.996 kilograms of cocaine of unknown quality. The record does not disclose when Soto was arrested.

## II. ANALYSIS

We review a finding of drug quantity for clear error. *United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007). The government must prove drug quantity by a preponderance of the evidence, *United States v. McGowan*, 478 F.3d 800, 802 (7th Cir. 2007); *United States v. White*, 360 F.3d 718, 720 (7th Cir. 2004), and generally a district court may rely upon uncontradicted factual information in a the presentence report when assessing whether the government has satisfied that burden, *see United States v. Thornton*, 463 F.3d 693, 700-01 (7th Cir. 2006); *United States v. Salinas*, 365 F.3d 582, 587-88 (7th Cir. 2004); *see also* FED. R. CRIM. P. 32(i)(3)(A) (providing that sentencing court "may accept any undisputed portion of the presentence report as a finding of fact").

*A. Soto-Piedra*

Prior to Soto's sentencing the probation officer recommended that he be held accountable for 170 kilograms of cocaine based on Ramirez's estimate that she obtained 5 to 7 kilograms from him each week from April to December 2004 at a price of $20,000 per kilogram. The probation officer arrived at 170 kilograms by assuming that the April-to-December period spanned 34 weeks and that Ramirez bought only 5 kilograms per week. Soto objected that the probation officer's calculation was not meaningfully corroborated. He contended that Ramirez's statement should be discounted because her role as an informant gave her incentive to embellish, and he also suggested through counsel that his own modest lifestyle refuted Ramirez's assertion that he was selling roughly half a million dollars of cocaine per month. But Soto did not deny that he sold cocaine to Ramirez over an extended period of time, nor did he offer any evidence of his own to contradict her estimate of their extended dealings.

The district court selected a base offense level of 38, *see* U.S.S.G. § 2D1.1(c)(1), after concluding that Soto distributed at least 150 kilograms of cocaine. The court relied not just on Ramirez's estimate, but also on Camarena's recorded representation to Hernandez that Soto had been buying from him up to 5 kilograms per week during some part of the previous year. After crediting Soto for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a), the court arrived at a total offense level of 36, which yielded a sentencing range of 210 to 262 months. The court sentenced Soto to 210 months' imprisonment.

Soto challenges the drug quantity, but he introduced no evidence calling into question the accuracy of the presentence report. When a defendant fails to do so, a

district court may rely entirely on the factual account in the report. *Artley*, 489 F.3d at 821; *United States v. Willis*, 300 F.3d 803, 807 (7th Cir. 2002); *United States v. Taylor*, 72 F.3d 533, 547 (7th Cir. 1995). The district court therefore did not commit clear error by relying on the probation officer's estimated cocaine quantity, and Soto's sentence must be affirmed.

Moreover, even if the sentencing court had been required to look beyond the uncontroverted presentence report, there is evidence to support the 150-kilogram finding. Camarena said during a wiretapped conversation that in the "last year" Soto would get "out up to five a week." Camarena certainly would know how much cocaine he was supplying to Soto, and his recorded statement supports Ramirez's assertion and the district court's conclusion that Soto was distributing 5 kilograms per week. And the district court could have interpreted "last year" to mean that Camarena worked with Soto for at least as long as Soto was distributing cocaine to Ramirez. For us to find clear error, we would have to conclude that the district court did not arrive at a permissible view of the evidence. *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985); *United States v. Marty*, 450 F.3d 687, 690 (7th Cir. 2006). And that is not the case here.

### B. Hernandez

Prior to Hernandez's sentencing the probation officer concluded that he was "responsible for between 15.996 to 16.996 kilograms of cocaine, of which the defendant had knowledge that 14 to 15 kilograms would be converted to crack cocaine at a 95% rate." This conclusion rests on the 1.996 kilograms of powder cocaine Hernandez

had with him when he was arrested coupled with the word from unidentified "law enforcement officials" that Hernandez had agreed to sell Camarena 14 to 15 kilograms knowing that the powder would be converted into crack. After subtracting two levels for acceptance of responsibility, *see* U.S.S.G. § 3E1.1(a), the probation officer calculated a total offense level of 36 and imprisonment range of 188 to 235 months.

Hernandez objected to the probation officer's assignment of a base offense level on the assumption that he was involved with crack. The government also objected to the presentence report because the probation officer had not included a two-level upward adjustment, *see* U.S.S.G. § 2D1.1(b)(1), for the gun Hernandez was carrying when he was arrested. The district court agreed with the government, and increased Hernandez's total offense level by two levels, which resulted in a guidelines range of 235 to 293 months' imprisonment. The court overruled Hernandez's objection to the probation officer's drug calculation, adopted that conclusion as its own, and sentenced Hernandez to 250 months.

Hernandez's sentence must be vacated because there is a dearth of evidence supporting the district court's conclusion that he was responsible for 14 to 15 kilograms of crack. The sentencing guidelines provide that relevant conduct, in the case of a jointly undertaken criminal activity, shall be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Jointly undertaken criminal activity is defined as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others." *Id.* As far as this record shows (and the govern-

ment concedes), Hernandez never sold crack to anyone, and so before he could be assigned a base offense level premised on an estimated amount of crack, the government needed to prove that Hernandez reached an agreement with Camarena to sell powder cocaine intending that it be converted into crack. *See United States v. Booker*, 248 F.3d 683, 688 (7th Cir. 2001); *United States v. Dorsey*, 209 F.3d 965, 967 (7th Cir. 2000). That did not happen here. As we noted earlier, a district court may rely upon uncontested factual details in a presentence report, but the say-so of some undisclosed "law enforcement official" that Hernandez understood that the powder he discussed on June 3 would be converted into crack is not a fact, but merely a conclusion. And that is all the presentence report provided in linking Hernandez to a substantial quantity of crack.

The government suggests that it was not required to demonstrate the existence of Hernandez's jointly undertaken criminal activity because he pleaded guilty to conspiracy. This proposition cannot be supported. In 1992 U.S.S.G. § 1B1.3 was amended specifically to disavow it. U.S.S.G. app. C, vol. I, amend. 439; *United States v. Ortiz*, 362 F.3d 1274, 1275, 1276-77 (9th Cir. 2004); *United States v. Perulena*, 146 F.3d 1332, 1337 n.11 (11th Cir. 1998); *United States v. Strange*, 102 F.3d 356, 360 n.6 (8th Cir. 1996); *United States v. McDuffy*, 90 F.3d 233, 235-36 (7th Cir. 1996). Conspiracy liability, as defined in *Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946), is generally much broader than jointly undertaken criminal activity under § 1B1.3. "Anyone who agrees to join a criminal undertaking is a conspirator," *United States v. Almanza*, 225 F.3d 845, 846 (7th Cir. 2000), but Hernandez is not trying to evade that label or undermine his guilty

plea. The scope of relevant conduct is "not necessarily the same as the scope of the entire conspiracy." U.S.S.G. § 1B1.3, cmt. n.2. "[I]n order to be held accountable for the conduct of others, that conduct must have been both in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity." *United States v. Edwards*, 115 F.3d 1322, 1327 (7th Cir. 1997); *accord United States v. Laboy*, 351 F.3d 578, 583 (1st Cir. 2003); *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997); *United States v. Otis*, 107 F.3d 487, 491 (7th Cir. 1997); *McDuffy*, 90 F.3d at 235. Foreseeability is a limitation on liability for conduct of others in furtherance of a jointly undertaken activity but is irrelevant when there is no jointly undertaken activity. *See McDuffy*, 90 F.3d at 236; *United States v. Dean*, 59 F.3d 1479, 1495 (5th Cir. 1995); *United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir. 1993). Hernandez's guilty plea establishes only that he conspired to distribute powder cocaine, and we see nothing in the plea agreement or in his admissions during the plea colloquy evidencing that he specifically undertook to possess and distribute any amount of crack, much less 14 to 15 kilograms.

Mere talk about a possible future undertaking, without more, is not an undertaking itself. *See United States v. Boniilla-Comacho*, 121 F.3d 287, 291-92 (7th Cir. 1997); *United States v. Garcia*, 69 F.3d 810, 820 (7th Cir. 1995); *United States v. Jewel*, 947 F.2d 224, 234 (7th Cir. 1991); *United States v. Ruiz*, 932 F.2d 1174, 1184 (7th Cir. 1991) (noting negotiated amounts may be considered at sentencing when the defendant has "actually arranged the details of a drug sale (e.g., price, quantity, location)"). Yet the government's argument rests entirely on one conversation in which Hernandez asked Camarena if he could

bank on Camarena taking 14 to 15 kilograms of powder cocaine that Hernandez hoped to get from a supplier. This was the beginning of a negotiation—a prelude to a possible agreement—but nothing more. And although the court may look to "any explicit agreement or implicit agreement fairly inferred," U.S.S.G. § 1B1.3 cmt. n.2, the import is that there must be an agreement. But here there was no agreement for Hernandez to supply or Camarena to buy cocaine of any type. At best the conversation between the two men amounted to Camarena expressing interest in cocaine that Hernandez might or might not be able to get from a particular supplier. And there is nothing in the record to suggest that Hernandez was capable of doing so. At this point, after all, none of the prior conversations between Hernandez and Camarena had resulted in a consummated drug deal. Just as in *Ruiz*, there is no evidence that Hernandez had access to 14 or 15 kilograms of powder cocaine. *See Ruiz*, 932 F.2d at 1184. Because this conversation does not evince any jointly undertaken criminal activity, it could not have been a basis for calculating Hernandez's guidelines range. *See United States v. Mellen*, 393 F.3d 175, 182-86 (D.C. Cir. 2004); *United States v. Rivera-Rodríguez*, 318 F.3d 268, 274 (1st Cir. 2003); *United States v. Whitecotton*, 142 F.3d 1194, 1199 (9th Cir. 1998); *see also United States v. Willis*, 476 F.3d 1121, 1129-31 (10th Cir. 2007) (remanding for factual findings as to scope of jointly undertaken criminal activity); *United States v. Mulder*, 273 F.3d 91, 118-19 (2d Cir. 2001) (same).

Furthermore, even if we could conclude from this conversation that Hernandez and Camarena had settled upon a jointly undertaken criminal activity, we still would vacate Hernandez's sentence because the gov-

ernment failed to establish that Hernandez contemplated that the 14 to 15 kilograms of powder cocaine he proposed to supply would be converted into crack by Camarena's customer. Other conversations demonstrate that Hernandez sold different grades of powder cocaine, and that he described the product that was good for making crack in terms of its high quality and the percentage return the ultimate buyer would get from "cooking" it. But nothing was said about quality or yield or "cooking" when Hernandez probed Camarena's interest in obtaining 14 to 15 kilograms, and the government does not say what it sees in the one recorded conversation that might suggest the men were talking about high-quality powder that would be cooked into crack. Similarly, nothing was said about what Camarena's customers would do with the cocaine if Hernandez could get it.

Actions of coconspirators that a particular defendant does not assist or agree to promote are generally not within the scope of that defendant's jointly undertaken activity. *See* U.S.S.G. § 1B1.3 cmt. n.2 (illustration (c)(1)); *United States v. Bustamante*, 493 F.3d 879, 887-88 (7th Cir. 2007); *Melton*, 131 F.3d at 1405; *United States v. Studley*, 47 F.3d 569, 576 (2d Cir. 1995). Hernandez contemplated the possibility of supplying Camarena with an unknown grade of powder cocaine, to be passed along by Camarena to an unknown customer with an unknown intention, and that is all that is shown by this record. The government put forth no evidence suggesting that converting the powder cocaine to crack was within the scope of Hernandez's contemplated undertaking. To conclude otherwise would be simply speculation. Hernandez is entitled to be resentenced.

### III. CONCLUSION

Accordingly, Soto's sentence is AFFIRMED; we VACATE Hernandez's sentence and REMAND for resentencing.