In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1613, 10-1616 & 10-1757

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSE ALVARADO-TIZOC,
ANTONIO DURAN, and
NOE DURAN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cr-00124—**Virginia M. Kendall**, *Judge.*

ARGUED MARCH 31, 2011—DECIDED SEPTEMBER 7, 2011

Before CUDAHY, POSNER, and MANION, *Circuit Judges.*

POSNER, *Circuit Judge.* The defendants pleaded guilty to conspiracy to distribute more than 400 grams of substances containing a detectable amount of fentanyl and more than a kilogram of substances containing a detectable amount of heroin. Alvarado-Tizoc was sentenced to 200 months in prison, Antonio Duran to 170

months, and Noe Duran to 121 months. The appeals challenge these sentences.

Fentanyl is a very potent synthetic narcotic, used lawfully as a painkiller and unlawfully as a substitute for heroin. See "Fentanyl," 1 *Encyclopedia of Substance Abuse Prevention, Treatment & Recovery* 400-02 (Gary L. Fisher & Nancy Roget eds. 2009). Because of its potency it must be greatly diluted before being consumed; otherwise it will kill. Peter Slevin & Kari Lydersen, "Heroin Users Warned about Deadly Additive," *Washington Post*, June 4, 2006, www.washingtonpost.com/wp-dyn/content/article/2006/06/03/AR2006060300602.html (visited Aug. 3, 2011, as were all the online materials cited in this opinion).

Deaths from overdoses of fentanyl by heroin addicts soared in 2006. See *id.*; Donna Leinwand, "Heroin Mix Tied to Dozens of Deaths," *USA Today*, May 5, 2006, www.usatoday.com/news/health/2006-05-04-heroin-mix_x.htm (quoting the executive director of the New Jersey Poison Information and Education System as saying that "our addicts are dropping like flies" from overdoses of fentanyl). Addicts' demand for fentanyl apparently had been augmented by a shortage of high-quality heroin, but it has fallen since 2006, probably because the deaths caused by overdosing on fentanyl induced more intensive efforts by law enforcers to disrupt the supply of the drug. Katherine Hempstead & Emel O. Yildirim, "Supply-Side Response to Declining Heroin Purity: The Fentanyl Overdose Episode of 2006" 1-11 (Working Paper Oct. 2009), www.economics.rutgers.edu/dmdocuments/EmelYildirim.

pdf); cf. U.S. Dept. of Justice National Drug Threat Intelligence Center, "National Drug Assessment 2010," Feb. 2010, pp. 30-32, 42 n. 22, www.justice.gov/ndic/pubs38/38661/38661p.pdf. The shortage of high-quality heroin may also have abated, though this is conjecture.

The defendants were wholesalers of heroin and fentanyl for illicit use. Their customers, the retail dealers, diluted the fentanyl (which already had been diluted to some extent) that they bought from the defendants in order to make it safer to consume. The dilution produced mixtures that contained less than 1 percent fentanyl, and the retailers sold these mixtures (doses) to their customers. The quantity (as measured by weight) of the greatly diluted fentanyl sold by the retailers was 11 to 16 times the quantity of fentanyl that the defendants had sold them. For sentencing purposes the weight of an illegal drug includes the weight of a mixture containing a controlled substance. U.S.S.G. § 2D1.1(c) n. A and Application Note 1; *United States v. Sowemimo*, 335 F.3d 567, 574 (7th Cir. 2003); cf. 21 U.S.C. § 841(b). Hence for sentencing purposes the retailers were selling much more fentanyl than their suppliers, who are the defendants in this case.

Nevertheless the judge attributed the entire amount of the retail sales to the defendants on the ground that their wholesaling was a "jointly undertaken criminal activity" (jointly with the retail sales). "[I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant[s] in concert with others, whether or not

charged as a conspiracy), [the defendants' sentences] shall be determined on the basis of . . . all reasonably fore- seeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); see also U.S.S.G. § 1B1.3 Application Note 2; *United States v. Salem*, 597 F.3d 877, 886 (7th Cir. 2010); *United States v. Soto-Piedra*, 525 F.3d 527, 531-32 (7th Cir. 2008). Even though the defendants didn't make any retail sales, they could foresee that the retail quantity would be greater than the wholesale quantity because of the need for additional dilution by retailers.

Having determined the quantity for which the defen- dants were responsible, the judge used the drug-equiva- lency tables in the Sentencing Guidelines to generate a base offense level by equating each gram of fentanyl— which is to say each gram of the doses containing fentanyl that were sold at retail, because of her finding that the wholesalers and retailers had been engaged in a jointly undertaken activity—to 2.5 grams of heroin. See U.S.S.G. § 2D1.1 Application Note 10(E). (We are simplifying. The table actually equates a quantity of each type of drug to a quantity of marijuana. A quantity of fentanyl is deemed to be 2.5 times the quantity of mari- juana that heroin is deemed to be. Hence for sen- tencing purposes 1 gram of fentanyl equals 2.5 grams of heroin.) These calculations, plus other adjustments unnecessary to discuss, generated what the judge believed to be the correct Guidelines ranges for the de- fendants, and she imposed sentences within those ranges.

Fentanyl is so similar to heroin that the defendants argue with some force that they didn't realize they were

buying fentanyl, as distinct from superstrong heroin. (They knew they were buying *something* superstrong because they knew it had to be greatly diluted to avoid killing consumers.) But for sentencing purposes the only knowledge required is knowledge that the substance that the defendants are selling (or conspiring to sell) is a controlled substance. U.S.S.G. § 1B1.3 Application Note 2(B)(a)(1); *United States v. Martinez*, 301 F.3d 860, 864 (7th Cir. 2002); *United States v. Lezine*, 166 F.3d 895, 906 (7th Cir. 1999); *United States v. Alvarez-Coria*, 447 F.3d 1340, 1344 (11th Cir. 2006) (per curiam); *United States v. Fragoso*, 978 F.2d 896, 902 (5th Cir. 1992). They don't have to know which controlled substance it is. This is a sensible rule; it encourages drug traffickers to determine the dangerousness of the drugs they sell and take steps to reduce the danger. And there is no novelty in punishing people more severely because of consequences, even if their intent was no more evil than that of criminals who failed to produce such consequences: otherwise murderers and attempted murderers would be punished with equal severity. The attempted murderer is the beneficiary of what philosophers call "moral luck"—he benefits from the chance fact that despite his efforts he failed to achieve his evil design.

The only vulnerable point in the sentencing of two of these defendants (Noe Duran challenges his sentence on an unrelated ground, which we discuss at the end of the opinion) was the judge's finding that the jointly undertaken criminal activity included the retail sale of the fentanyl. There was insufficient evidence that the retailers to whom the defendants sold heroin and

fentanyl were, so far as their relation to the defendants was concerned, anything more than buyers. The government points out that the defendants "specifically sought out, and received, information about [the retailers'] heroin business . . . and thus purposefully kept apprised of their operation. For instance, they asked specific questions about how much money [one of the retailers] made from the heroin he obtained from them" and informed them that "the 'new heroin' [which was actually fentanyl] could be diluted even further." All this just shows a wholesaler's natural motivation to gauge demand for his product and if possible increase that demand and so be able to raise his price. The government also notes that the defendants were "exclusive supplier[s]" of the retailers and therefore had a "vested interest in the success and profitability" of the operation. But exclusive dealing is common and every wholesaler has a vested interest in the success of his retailers. And finally the fact that the buyers diluted the fentanyl they received (and that this was foreseeable to the defendants) no more proved a conspiracy than the fact that a seller of chocolate syrup to a soda fountain knows that the syrup will be mixed with milk or soda to make chocolate milk shakes or chocolate sodas rather than being sold in its original, undiluted form makes the seller a conspirator in the retail sale of adulterated chocolate drinks.

A seller is not a party to a conspiracy with a mere buyer from him. E.g., *United States v. Vallar*, 635 F.3d 271, 286-87 (7th Cir. 2011); *United States v. Colon*, 549 F.3d 565, 567-71 (7th Cir. 2008). And while the applicable

Sentencing Guideline as we know uses the term "jointly undertaken activity" rather than "conspiracy," and indeed provides that the jointly undertaken activity need not be "charged as a conspiracy," the case law generally treats the terms "jointly undertaken activity" and "conspiracy" as interchangeable. See, e.g., *Gray-Bey v. United States*, 156 F.3d 733, 740-42 (7th Cir. 1998); *United States v. McDuffy*, 90 F.3d 233, 235-36 (7th Cir. 1996). The concept of conspiracy is frequently employed in criminal cases without a conspiracy actually being charged, as when proof of a conspiracy is used to render a statement by a co-conspirator admissible against the defendant; and so it is with the Guidelines' equivalent, a "jointly undertaken activity."

Some cases point out that "jointly undertaken activity" should not be equated to "conspiracy" because a defendant could have joined a conspiracy without having joined in or agreed to all the activities undertaken by it. *United States v. Soto-Piedra*, *supra*, 525 F.3d at 531-32, and cases cited there; U.S.S.G. § 1B1.3 Application Note 2. But there is no actual conflict; the cases we cited earlier (*Gray-Bey* and *McDuffy*) impose a sentencing enhancement on a conspirator for a jointly undertaken activity only if the activity was reasonably foreseeable to him, for foreseeing or being charged with foreseeing an activity makes him a joint participant with the other conspirators. *United States v. Hernandez-Santiago*, 92 F.3d 97, 100 (2d Cir. 1996). But this qualification on equating conspiracy to jointly undertaken activity cannot help the government; if there was no conspiracy between the defendants and the retailers, *a fortiori* the former were

not engaged in a jointly undertaken activity with the latter. To say otherwise would make sellers liable for their buyers' activities as if they were co-conspirators, when they were not.

So: a jointly undertaken activity was not proved in this case. But a point of more general significance for cases involving fentanyl and other superstrong narcotics is that attributing the amount of the diluted retail product to the seller (whether the seller is a retailer, or a wholesaler conspiring with a retailer) in computing the Guidelines sentence involves double counting. The quantity of the diluted retail product, if attributed to a wholesaler defendant, will already account, in part anyway, for the fact that fentanyl is more potent than heroin; if the same weight of fentanyl and heroin bought by a retailer makes 50 retail doses of fentanyl versus 5 of heroin, the seller of fentanyl will be "credited" with 10 times the quantity as the seller of heroin. To multiply 10 by 2.5 is to double count— more precisely to 2.5-count. And double or other multiple counting—at least when the judge is unconscious of doing it—is improper even when wholesalers and retailers are co-conspirators, which, to repeat, they were not shown to be in this case.

It is understandable that the Guidelines should treat the sale of fentanyl more harshly than the sale of heroin. Fentanyl is more dangerous because it's stronger—gram for gram, it is 50 times as potent as heroin. National Institute on Drug Abuse, "Heroin: Abuse and Addiction" 7 (2005), http://drugabuse.gov/PDF/RRHeroin.pdf. It therefore requires more dilution to be safe, and so

creates a greater risk of fatal overdoses because of failures, common in the illegal drug trade, of warning and of sufficient dilution. And since, because of its potency, a given quantity produces more doses, and hence greater consumption per unit of quantity, than the same quantity of a weaker drug, see Hempstead & Yildirim, *supra*, at 11; U.S.S.G. § 2D1.1 Application Note 9, a wholesaler of fentanyl will reach more consumers than a wholesaler of the same quantity of heroin. The 2.5-to-1 ratio is a crude attempt to equalize a fentanyl trafficker to a heroin trafficker who sells a greater quantity but does not reach as many consumers. H.R. Rep. No. 99-845, 99th Cong., 2d Sess. 12 (1986).

Thus, irrespective of the fact that the quantities sold by the retailers could not be attributed to the defendants on the theory that they were conspiring with the retailers (rather than merely supplying them), the fact that by selling fentanyl instead of heroin the defendants were responsible for a larger number of doses sold to the ultimate consumers was a basis for a higher sentence—but a basis already partly reflected in the drug-equivalency tables in the Guidelines.

Application Note 9 to U.S.S.G. § 2D1.1 states that "since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." How high a seller is in the chain of distribution cannot be determined solely by the

relative potency of two drugs, but a judge, exercising the discretion granted by the *Booker* doctrine to vary from the Guidelines, could use the relative number of doses produced by a particular quantity of drugs as a sentencing factor. Mathematical accuracy is not achievable and so is not required. Even at the wholesale level, drugs—heroin as well as fentanyl—are diluted by the addition of inactive ingredients. The amount of dilution in this case varied both between and within the two drugs, both of which the defendants sold. But an approximate ratio is sufficient for sentencing purposes; and once that ratio is estimated, to then apply the 2.5:1 ratio would overstate the gravity of the fentanyl offense relative to the heroin offense.

The drug-equivalency tables are widely criticized on a variety of grounds—including by the Sentencing Commission itself. See U.S. Sentencing Commission, "Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform" 50 (Nov. 2004), www.ussc.gov/Research/Research_Projects/Miscellaneous/ 15_Year_Study/15_year_study_Full.pdf. The House Report that we cited earlier acknowledges that the drug equivalencies in the tables are minimums: "the Committee has not generally related [the quantities in the drug-equivalency tables] to the number of doses of the drug that might be present in a given sample. The quantity is based on the *minimum quantity* that might be controlled or directed by a trafficker in a high place in the processing and distribution chain" (emphasis added).

Application Note 9 provides a more flexible approach to determining the relative gravity of crimes involving drugs of differing potency than the drug-equivalency tables do.

Not being a slave to the Guidelines (thanks to the *Booker* doctrine), a judge could give a fentanyl wholesaler an additional sentence enhancement because of the greater risk of overdoses that fentanyl creates compared to heroin. What would be improper would be for the judge, having determined that a defendant's fentanyl produced 10 (or some other number) times as many retail doses as the equivalent weight of heroin, to multiply 10 by 2.5 and thus treat the defendants as if they had sold not 10 times as much drug (from a consumer standpoint) as the same weight in heroin, but 25 times as much.

Adjusting for potency makes more sense than adjusting for weight. Emphasis on the weight of a defendant's drugs (in this case the weight of the dilute drugs sold by customers of defendants), whether or not they are diluted, has the perverse effect of giving drug dealers an incentive to possess and sell drugs of high purity or potency and makes the length of sentences depend perversely on the weight of the inactive ingredients in the drugs. Jonathan P. Caulkins et al., "Mandatory Minimum Drug Sentencee: Throwing Away the Key or the Taxpayers' Money?" 22 (RAND Corp. Drug Policy Research Center 1997).

In short, the judge in this case should have calculated the Guideline ranges on the basis of just the defendants' sales and then have adjusted their sentences to reflect

considerations not taken into account by the 2.5:1 ratio, such as the many more retail doses that a given quantity of fentanyl produces than the same quantity of heroin. We do not know whether she would have ended up giving the same sentences, and so we must vacate the sentences of Alvarado-Tizoc and Antonio Duran and remand for resentencing.

Alvarado-Tizoc asks us also to instruct the district judge to sentence him under a provision of the Sentencing Guidelines that (authorized by the Sentencing Reform Act) allows the judge to sentence a defendant below the statutory minimum if, before sentencing, "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2(a)(5); see 18 U.S.C. § 3553(f)(5). The burden of proof is on the defendant. *United States v. Galbraith*, 200 F.3d 1006, 1016 (7th Cir. 2000). The judge was entitled to find that it had not been carried.

The government presented evidence that the defendant had concealed the extent of his illegal drug activities. He was unable to counter the evidence with anything stronger than his denials. The government's evidence was not strong, but it didn't have to be, as there was nothing on the other side but the defendant's say-so, to which the judge was entitled to give little weight. The defendant complains about the judge's having remarked that the defendant "lost his safety valve . . . because the Government doesn't believe him."

But what the judge was driving at was that because the government refused to accept the defendant's assertion that he had provided it with all the information that he possessed concerning the offenses in which he was involved, and because the government backed up its refusal with evidence, the defendant had been unable to carry his burden of proof. So the judge committed no error in rejecting safety-valve relief, and so this will not be an issue for consideration in resentencing this defendant.

Noe Duran's claim, which is unrelated to the claims presented by the other two defendants, is that in sentencing him the judge failed to take account of his diminished mental capacity, which should have made him eligible for a sentencing discount. U.S.S.G. § 5K2.13. He argues that he began using drugs at a young age, that he was kicked out of a number of high schools, and that his father (defendant Antonio Duran) was a drug dealer. But he didn't argue diminished mental capacity to the sentencing judge; he asked only for leniency because of his difficult upbringing. The judge considered and rejected the argument, which was anyway very weak; it amounts to saying that a criminal who begins using drugs when young and whose father is a drug dealer deserves leniency (a family discount, as it were). The judge noted the gravity of Noe Duran's crime, which involved smuggling extremely dangerous drugs into Chicago in body cavities (not his own), and gave him a sentence that we cannot say was unreasonable.

The judgment in Noe Duran's case is affirmed; the judgments in the other two appeals are vacated with directions to resentence those defendants.