POSNER, Circuit Judge,
concurring and dissenting.
I join Judge Manion’s opinion with respect to all the appellants except Adams. He is entitled, I am persuaded, to be re-sentenced. Application Note 2(c)(6) to section 1B1.3 of the sentencing guidelines is dispositive:
Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.
Adams is P, not Q, because he doesn’t pool his resources and profits with any other street-level dealer. He “knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells” and “share[s] a common source of supply [with them], but otherwise operate[s] independently.” Because Adams is P, he is “not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them.” I emphasize “jointly undertaken criminal activity” to make clear that it would not be enough that they were co-conspirators of his to justify a sentence based on the quantity of drugs sold by the other dealers: “Conspiracy liability, as defined in Pinkerton v. United States, 328 U.S. 640, 646-48, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), is generally much broader than jointly undertaken criminal activity under § 1B1.3.” United States v. Soto-Piedra, 525 F.3d 527, 531 (7th Cir. 2008).
The majority opinion deems Adams distinguishable from P because P competes with the other street-level dealers and Adams did not. But the application note doesn’t say that P competes with other dealers. Nor are competitors necessarily less likely to engage in joint undertakings than cooperators; competitors may decide to collude, and thus become cooperators. In any event there is no evidence that Adams did not compete with other street-level dealers who bought from Bostic’s *751 gang. The government says that, unlike P, Adams “worked for (and benefitted from) Bagley,” his contact man in the gang. But that is just to say that Adams and the other street-level vendors had a common source of supply, namely the same member of the Bostic gang.
The government and the majority opinion confuse a vertical agreement — P’s agreement, which the application note tells us does not create a joint criminal undertaking — with a horizontal agreement, which does. Adams agreed to distribute heroin for the Bostic gang at a specified location and to remit the proceeds of his sales to Bagley, a supervisory employee of Bostic. In exchange he received a cut of those proceeds. He thus was a commissioned salesman. Of course he knew that the gang marketed heroin through other street-level vendors in his neighborhood, and of course he knew what they did for the gang — the same thing he did. But he did not work with or help them. At oral argument the government’s lawyer said that the dealers looked out for each other, for example by warning each other when police appeared. But he acknowledged that no evidence was presented at Adams’s sentencing hearing that Adams did, or had agreed to do, any of that “looking out.”
The district judge based his attribution to Adams of the heroin sold by the other dealers on Adams’s “understanding at some level that other people are doing the same thing and you’re all part of the same overall group.... I think that is sufficient to constitute knowledge and awareness of a jointly undertaken criminal activity.... What you have to know is that you’re part of an activity that is being done in concert with them. And even if you’re both at the bottom end ... of the organizational chart, if you understand that there’s a chart that goes up to the same apex and it’s all the same organization, I think that is sufficient.” The judge was confusing knowledge of what other people are doing with agreeing with other people to do something. Adams knew that Bostic had other street-level vendors; but he had no agreement with them. Suppose a McDonald’s franchisee in Chicago is bulking out his hamburgers with horse meat. Another McDonald’s franchisee, this one in Peoria, learns what the Chicago franchisee is doing, thinks it’s a clever way of cheating customers, and starts doing it himself. In merely acting upon knowledge of what someone in the same franchise organization is doing, he is not a co-conspirator of that someone even if he buys his horse meat from the same vendor.
The government labors under the same misconception concerning the meaning of conspiracy as the district judge did when it tells us in its brief that “at the end of his shift, Adams met Bagley to turn in his proceeds, just like the other street sellers in the Bostic Organization. And as he admitted, Adams knew that the money that those street sellers earned was returned to Bagley.... This evidence proved that Adams joined this criminal scheme in concert with others.... Adams did not simply sell heroin in the same geographic area in which others sold heroin. He knowingly sold the Bostic Organization’s heroin in the Bostic drug territory alongside other street-sellers who likewise worked for the Bostic Organization.... Moreover, Adams knew that he and other street sellers worked for Bagley.... The conduct of those other street-sellers was therefore foreseeable to Adams.” The majority opinion echoes this when it remarks that “Adams does not claim that the sales of the other sellers were not foreseeable to him.” If you sell raspberries in Treasure Island, you can foresee that raspberries are also being sold in Whole Foods.
*752 What the government asserts and the majority opinion echoes is all about knowledge, and just about knowledge. It is not about cooperation. It is no different from my hypothetical McDonald’s case. It flouts unequivocal statements in cases such as United States v. Salem, 597 F.3d 877, 889 (7th Cir.2010), that awareness of criminal activity doesn’t make that activity “jointly undertaken.” See also United States v. Soto-Piedra, supra, 525 F.Sd at 531; United States v. Reese, 67 F.3d 902, 909 (11th Cir.1995).
The majority opinion invokes Application Note 2(c)(8), like 2(c)(6) an attempt by means of example to explain what “jointly undertaken criminal activity” is. 2(c)(8) reads as follows (the deleted material, indicated by the ellipses, consists merely of citations to subsections of the guidelines):
Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana ... and aided and abetted each other’s actions ... in carrying out the jointly undertaken criminal activity. In contrast, if Defendants T, U, V, and W were hired individually, transported their individual shipments at different times, and otherwise operated independently, each defendant would be accountable only for the quantity of marihuana he personally transported.... As this example illustrates, in cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.
The majority opinion quotes only the last sentence, thus missing the distinction between the two examples involving the four offenders. In the first example the four dealers “coordinate their importation efforts ... for mutual assistance and protection” and thus are “engaged in a jointly undertaken criminal activity.” In the second example the four “were hired individually, transported their individual shipments at different times, and otherwise operated independently,” and so “each defendant would be accountable only for the quantity of marihuana he personally transported.” That is Adams.
The majority opinion relies on United States v. Smith, 13 F.3d 860 (5th Cir.1994), a case in which four crack dealers shared a house which they used as “a very rudimentary shopping center or flea market for crack”; these “friendly competitors” had “created a marketing site greater than the sum of its parts,” producing “a marketing symbiosis that far outweighed its minor competitive aspect.” Id. at 865. Although the four were joint occupants of a crack house — a more intimate relation than that between Adams and the other sellers of drugs supplied by Bostic — Smith stood out from the other crack dealers and was the only one whose sentence was increased in recognition of the existence of a jointly undertaken criminal activity. Adams is no Smith.
*753 Yet the majority opinion regards the present case as a stronger one for the government than Smith was because “Adams and the other sellers working the morning shift in Bostic’s open-air drug market did not own the drugs,” which “shows that Adams had much less independence than the dealers in Smith” Earlier the majority opinion had stated that Adams was “selling heroin owned by [the Bostic] organization” rather than owned by himself. I don’t think that distinction has the slightest relevance. Remember that the question is whether Adams is P or Q in Application Note 2(c)(6). The note doesn’t mention ownership. Nor is ownership a sine qua non of competition, emphasized by the majority opinion (mistakenly as I suggested) as the key to distinguishing Adams from P. Often competition is between owners, but often it is not, as in the case of retail salesmen who work on commission. If you go to buy a pair of shoes, the salesmen you encounter will not own the shoes they’re trying to sell but they may well be in competition with each other for commissions. Or think of a bookstore: what difference does it make whether the store buys books from publishers and resells them, or sells them as the publishers’ agent and so title passes from the publisher to the store’s customer when the customer buys a book?
When one is dealing with illegal activity, moreover, distinctions between owner and agent, sale and consignment, are usually blurred and generally irrelevant. Why should Adams’s sentence depend to the slightest degree on whether title to the drugs did or did not pass to him? The majority opinion states that Adams had less “independence” than the defendants in the Smith case by virtue of not owning the drugs he sold. But his dependence was on the Bostic supervisor who furnished him the drugs to sell on a consignment basis, not on the other dealers, which would be the dependence (suggesting they were jointly dealing drugs) relevant to Application Note 2(c)(6).
The sentencing error made by the district judge and condoned in the majority opinion is not trivial. The inclusion of sales of heroin by the other dealers increased Adams’s sentencing range from 188-235 months to 262-327 months and his statutory minimum sentence from 5 years to 10. The judge sentenced him to 180 months, dipping well below the guidelines range because he thought its bottom, 262 months, “way excessive.” A reduction in the guidelines range might prompt him to reduce the sentence further, though because this is not certain a limited remand would be appropriate to enable him to reconsider the sentence.