In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-2125, 12-2379, 12-2759, and 12-2975

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TOMMY ADAMS, CHRISTOPHER
HUNTER, LADONTA GILL, and DANA
BOSTIC,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 CR 673 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 26, 2013 — DECIDED FEBRUARY 26, 2014

Before POSNER, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Christopher Hunter, Tommy
Adams, Ladonta Gill, and Dana Bostic were charged (along
with ten others) in a multi-count indictment with conspiracy to
possess with intent to distribute, and distribution of 1000
grams or more of mixtures and substances containing a
detectable amount of heroin, in violation of 21 U.S.C. § 846 and
§ 841(a)(1). All four eventually pleaded guilty and now appeal
either (or both) their convictions and sentences. Because
Hunter entered a blind guilty plea, thereby waiving his right

to appeal pre-trial rulings, we dismiss his appeal. We also
reject Adams's contention on appeal that the district court
erred in calculating the quantity of heroin for which he was
responsible. However, we agree with Gill and Bostic that the
district court erred in enhancing their guideline offense levels
for maintaining a "stash house" because that guideline
provision was not in effect during the commission of their
offenses. Thus, we remand for the limited purpose of allowing
the district court to resentence Gill and Bostic based on the
correct guideline range. We reject, though, Bostic's attempt to
challenge his guilty plea because the change of plea hearing
establishes his plea was knowing and voluntary. We also reject
Bostic's assertion that the district court erred in considering, as
a sentencing factor, violence engaged in by the New Breeds
gang without specifying what acts of violence it was holding
him responsible for. We do not require a district court to make
specific findings concerning the § 3553 factors. It is clear the
court considered them and we are able to fully review the
sentence. Accordingly, we DISMISS in part, AFFIRM in part,
and REVERSE and REMAND, in part.

## I.

Dana Bostic controlled the New Breeds gang which
operated on the west side of Chicago and which, among other
things, ran a large heroin distribution operation. In the fall of
2009, the Chicago Police Department and the Drug Enforce-
ment Administration ("DEA") launched an investigation into
the New Breeds organization and its heroin trafficking. As part
of the investigation, the Chicago Police Department and the
DEA conducted controlled purchases of heroin; conducted
surveillance; interviewed informants and cooperating wit-

nesses; obtained court-authorized wiretaps; and seized more than 8 kilograms of heroin, as well as numerous firearms.

The investigation revealed that approximately two or three times a week, Bostic obtained 100 to 200 grams of heroin from his heroin suppliers, paying the suppliers $6,500 per 100 grams of heroin. After obtaining these wholesale quantities of heroin, Bostic and higher-ups in the New Breeds gang, including Ladonta Gill, took the heroin to various stash houses where they mixed the wholesale quantities of heroin with additives in order to dilute the quality and increase the quantity of heroin for street sales. This cutting process doubled the amount of heroin that made it to the streets.

After cutting the heroin, street supervisors and runners, such as Aaron Bagley and Maurice Davis, distributed the drugs to street sellers in the form of a "pack" or a "jab." These were strips of tape or baggies containing 13 or 14 user-quantities of heroin. Each user-quantity of heroin was about .1 gram and sold for $10. After selling a jab of heroin, the street sellers typically returned $100 to the street supervisor and kept, as compensation, the remaining proceeds, either in cash or heroin. Daily sales of the Bostic heroin totaled between $4,000 and $10,000.

Street sellers sold the Bostic heroin on a daily basis, from about 6:00 a.m. to at least 8:00 p.m., in an area controlled by the Bostic organization and bordered by Pulaski, Van Buren, Congress and Karlov Streets. Typically four or five street sellers would be selling the heroin in the Bostic drug territory at any given time. Tommy Adams and Christopher Hunter were two such sellers.

Based on this and extensive additional evidence, the government on November 3, 2010, charged Bostic, Gill, Hunter, Adams, and ten others in a twenty-two-count indictment with conspiracy to possess with intent to distribute, and distribution of 1000 grams or more of mixtures and substances containing a detectable amount of heroin, in violation of 21 U.S.C. § 846 and § 841(a)(1).

This appeal involves only the four above-named co-conspirators, all of whom, under different circumstances, pleaded guilty. Hunter pleaded guilty under a blind plea to Count One of the indictment pursuant to a written plea declaration. In that plea declaration, Hunter unilaterally stated that he "expressly reserve[d] the right to appeal" the district court's denial of his motion to suppress Title III wiretap evidence. Hunter now seeks review of the denial of that motion to suppress.

Adams pleaded guilty pursuant to a written plea agreement. In his plea agreement, he reserved the right to contest the amount of heroin attributable to him. On appeal, Adams contends that the district court clearly erred in attributing between one and three kilograms of heroin to him which, given his career offender status, resulted in a mandatory minimum sentence of ten years and a guideline range of 262 to 327 months' imprisonment. The district court sentenced Adams to 180 months' imprisonment.

Gill pleaded guilty pursuant to a plea agreement and reserved his right to appeal his sentence. He now challenges the district court's calculation of his sentencing level; specifically, he argues the district court wrongly enhanced his sentencing level by two for maintaining a stash house, under U.S.S.G. § 2D1.1(b)(12).

Bostic entered a blind guilty plea. He now claims that his guilty plea was involuntary because he was not informed that his guilty plea would preclude him from challenging the district court's denial of the emergency motion to continue the trial he had filed shortly before he pleaded guilty. Bostic also attempts to challenge that denial on appeal. And like Gill, Bostic argues that the district court erred in enhancing his sentence for maintaining a stash house. Finally, Bostic maintains that the district court erred in sentencing him based on violence undertaken by various co-conspirators, without specifying the violence the court attributed to Bostic.

## II.

### A.  Hunter's Appeal

First, we consider Hunter's appeal. Hunter attempts to challenge the district court's denial of his motion to suppress various incriminating evidence obtained through Title III wiretaps. "But there is an immediate and obvious barrier to his appeal." *United States v. Adigun*, 703 F.3d 1014, 1018 (7th Cir. 2012). Hunter entered an unconditional "blind plea" of guilty. And "[a]n unconditional guilty plea precludes challenge to the denial of a motion to suppress because the guilty plea constitutes a waiver of non-jurisdictional defects occurring prior to the plea." *Id.* at 1014–15.

In his opening appellate brief, Hunter's attorney stated that in his plea declaration, Hunter had expressly reserved the right to appeal the denial of his motion to suppress. But a defendant cannot unilaterally reserve the right to appeal pretrial motions. Rather, Fed. R. Crim. P. 11(a)(2) requires both the government and the district court to agree to a conditional plea. There was no such acquiescence in this case. At no time during the change

of plea hearing did Hunter or his attorney raise his attempt to reserve the right to appeal the denial of his motion to suppress. When a defendant fails to comply with Rule 11(a)(2)'s requirements of obtaining "unequivocal government acquiescence" and "the explicit consent of the district court," this court lacks jurisdiction to hear those claims. *United States v. Combs*, 657 F.3d 565, 569 (7th Cir. 2011).

At oral argument, Hunter's attorney conceded the error and asserted that his failure to obtain the government and district court's approval of the reservation could constitute ineffective assistance of counsel. Whether this failure does in fact constitute ineffective assistance of counsel is questionable. *See Adigun*, 703 F.3d at 1020 n.1. But, as Hunter's attorney also recognized, it would not be appropriate for him to argue his own ineffectiveness in this appeal. So we leave that question for another day and reject Hunter's attempt to now challenge the denial of the motion to suppress.

### B.  Adams's Appeal

On appeal, Adams challenges only his sentence. Specifically, he argues that the district court erred in determining that he was responsible for between one and three kilograms of heroin. The district court found Adams responsible for this quantity of heroin based on the heroin he personally sold, as well as the heroin sold by other street-level sellers who were working alongside him during the 6:00 a.m. to noon shift.[1]

---

[1]  The amount of heroin Adams personally sold totaled less than one kilogram of heroin. The mandatory minimum sentence for less than one kilogram of heroin is five years; whereas, for quantities of one to three kilograms of heroin, the mandatory minimum sentence is ten years. The

(continued...)

This court reviews a district court's drug quantity finding for clear error. *United States v. Barnes*, 602 F.3d 790, 794 (7th Cir. 2010). We will reverse such a finding only if, "after reviewing the entire record, [we] are left with the firm and definite conviction that a mistake has been made." *United States v. Marty*, 450 F.3d 687, 689–90 (7th Cir. 2006).

Under the sentencing guidelines, the drug quantity attributable to a defendant includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). "A 'jointly undertaken criminal activity' is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3(a)(1)(B), Application Note 2. And "[i]n determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.*

Adams argues that the district court clearly erred in holding him responsible for quantities of heroin sold by other street-level sellers, claiming that those sales were not a "jointly undertaken criminal activity." Adams bases his argument in large part on Application Note 2(c)(6) to U.S.S.G. § 1B1.3(a)(1)(B). That note illustrates the concept of "jointly

---

[1] (...continued)

higher quantity of heroin involved also translated into a total guideline offense level three levels higher.

undertaken criminal activity" with this example and explanation:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a)(1)(B), Application Note 2(c)(6).

Adams argues that he is like Defendant P, operating independently from the other street-level sellers. Or as he put it at oral argument—he was merely an independent contractor, running a separate franchise. Thus, according to Adams, he was not acting jointly with the other street-level sellers for purposes of 1B1.3(a)(1)(B).

At first blush, Application Note 2(c)(6) seems to fit Adams's scenario. But as the Application Notes also explain:

> [I]n cases involving contraband (including con-
> trolled substances), the scope of the jointly under-
> taken criminal activity (and thus the accountability
> of the defendant for the contraband that was the
> object of that jointly undertaken activity) may
> depend upon whether, in the particular circum-
> stances, the nature of the offense is more appropri-
> ately viewed as one jointly undertaken criminal
> activity or as a number of separate criminal activi-
> ties.

U.S.S.G. § 1B1.3(a)(1)(B), Application Note 2(c)(8).

The "particular circumstances" involved here change the
complexion of this case. In this case, Adams admitted at his
change of plea hearing that he was one of three or four other
street-level sellers who worked between 6:00 a.m. and noon,
"selling heroin on behalf of Bagley and other New Breeds gang
members." *See* Adams's Change of Plea Hearing at 22–23.
Bagley was a street supervisor who distributed the heroin to
Adams and the other street sellers and then collected the
proceeds. While Adams stated that his knowledge of the other
individuals in the distribution chain above Bagley was limited,
he otherwise agreed with the government's proffer of the
factual basis for the change of plea, which included the
statement that he and the other street sellers sold heroin "on
behalf of Bagley and other New Breeds gang members." He
also agreed with the government's characterization of Bagley
as a "supervisor." Thus, in this case, Adams and the other
street sellers were working for the same organization, during
the same shift (6:00 a.m. to noon), for the same supervisor, and
selling heroin owned by that organization. Adams also was not
merely working in "the same geographic area" as the other

street-level sellers; he was "working as a street worker in Bostic's organization," selling drugs in the a territory controlled by the New Breeds gang.[2]

These facts speak not of several street-level sellers operating independently to run their own drug franchises, but rather of the Bostic organization running one drug store with several employees staffing the various shifts. In fact, that was the government's theory before the district court—that the Bostic organization ran an open-air drug store which attracted customers by having so many sellers available with its product. The government explained that by having a ready access to drugs and several sellers on hand, the Bostic organization attracted customers to the market. And thus, while Adams and the other street-level sellers might be competing for their commission, the government argued that

> because of the number of sellers all working there for the Bostic organization, customers could come in, [take the "L"], and they knew they would find sellers there who were selling heroin openly on the street. These people were not competing with each other. The reality is that you needed the sheer critical mass of people to make this a successful

---

[2] The government also represented at oral argument that the street sellers alerted each other to the presence of police. The government, though, did not rely on this fact at sentencing. Clearly, this fact would further show that the street sellers were working together to further the same endeavor. But there was apparently much about the New Breeds gang left unsaid at sentencing. *See* Mick Dumke, "Anatomy of a Heroin Ring," Chicago Reader, Feb. 14, 2013, http://www.chicagoreader.com/chicago/gang-violence-heroin-new-breeds-vice-lords/Content?oid=8761736 (visited Feb. 8, 2014).

open-air drug market, and the defendant was a part of that. The people who were out there were not competing with him. They were part of the reason that they were able to draw customers in from all over the city.

The district court found the government's argument persuasive and, given the facts of this case, that conclusion was eminently reasonable.

Similarly, in a case involving crack dealers operating out of the same house—but arguably with different suppliers—the Fifth Circuit found the "marketing symbiosis" supported a finding of jointly undertaken criminal activity. *See United States v. Smith*, 13 F.3d 860, 864–65 (5th Cir. 1994). In *Smith*, Smith, Cheney and Adams were dealers operating out of the same crack house. Smith's co-defendant, Phillips, had flagged down two undercover officers who indicated they wanted some "rocks." Phillips directed them to the crack house and the trio showed the officers their wares. The officers purchased some crack from Smith and then gave the "bust" signal and a raid ensued. The four retreated into the house, where they were arrested. None had crack on his person, but officers recovered 3.9 grams of cocaine base from the floor of the house. That crack was of a different purity and color than the crack Smith had sold the undercover agents. Smith maintained that it was not her crack and that therefore the district court erred in sentencing her based the amount of crack she sold, plus the 3.9 grams recovered from the house.

On appeal, the Fifth Circuit held that Smith was responsible for the crack recovered from the premises even if it was owned by a different dealer, because the facts support a finding that "Smith agreed to engage in jointly undertaken criminal activity

with Cheney and Adams."[3] In reaching this conclusion, the *Smith* court reasoned,

> the house had become a very rudimentary shopping center or flea market for crack, replete with Phillips, its "barker," and the friendly competitors who as a whole created a marketing site greater than the sum of its parts. The presence of multiple, part-time pushers and a larger supply for users produced a marketing symbiosis that far outweighed its minor competitive aspect.

*Id.*

The facts in this case are even more demonstrative of a jointly undertaken criminal activity than the facts in *Smith*. First, in this case, Adams and the other sellers working the morning shift in Bostic's open-air drug market did not own the drugs. While that factor is not dispositive, it shows that Adams had much less independence than the dealers in *Smith*. Yet the Fifth Circuit found Smith had engaged in jointly undertaken criminal activity with the two other dealers. Second, in *Smith*, there was evidence the crack came from different sources, *id.* at 864, which also indicates more independence. Here, though, Adams and the other sellers were "selling heroin on behalf of Bagley and other New Breeds gang members." *See* Adams's Change of Plea Hearing at 22–23. Thus, the facts in this case are

---

[3] Cheney and Adams were not charged federally. *See Smith*, 13 F.3d at 862 n.2. And while Phillips was also held responsible for the 3.9 grams of crack recovered from inside the house, the Fifth Circuit reversed his sentence and remanded for resentencing because the government had not presented any evidence, and the district court had not found, that Phillips had jointly undertaken criminal activity with Cheney and Adams.

even more supportive of a finding of jointly undertaken criminal activity than those at issue in *Smith.*

Moreover, even if Adams's independent contractor characterization was a reasonable view of the facts, there was no clear error because "[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *United States v. Bush*, 79 F.3d 64, 66 (7th Cir. 1996). Accordingly, we cannot say that the district court clearly erred in finding Adams acted jointly with the other street-level sellers who staffed the Bostic open-air market during the morning shift and sold drugs on behalf of Bagley and other New Breeds gang members.

Adams does not claim that the sales of the other sellers were not foreseeable to him. Nor does he contest that, if he is held accountable for the drugs sold by the other street-level sellers during the shifts he worked, the quantity of drugs involved was between one and three kilograms of heroin. Accordingly, because the district court did not clearly err in finding those sales part of the jointly undertaken criminal activity, the district court did not err in holding Adams responsible for between one and three kilograms of heroin and sentencing him accordingly.

### C. Gill's Appeal

Like Adams, Gill only challenges his sentence. He argues that the district court erred in enhancing his sentencing level by two for maintaining a stash house, pursuant to U.S.S.G. § 2D1.1(b)(12). Specifically, Gill maintains that applying this enhancement in his case violated the Ex Post Facto clause of the Constitution because the conspiracy ended "on or about

August 10, 2010" but the sentencing enhancement was not effective until November 2010.

At the time the district court sentenced Gill, the controlling law in this circuit was that, because the guidelines were discretionary, there was no Ex Post Facto concern. *See United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006). This court declined to overrule *Demaree* on several occasions, including in *United States v. Peugh*, 675 F.3d 736, 741 (7th Cir. 2012). However, the Supreme Court, overruled *Demaree* in *Peugh v. United States*, 133 S.Ct. 2072, 2088 (2013), holding that "a court's use of the Guidelines in effect at the time of sentencing was an ex post facto violation, as the Guidelines had changed to the detriment of the defendant after he committed his offenses."

The government acknowledges that under *Peugh*, Gill's sentence should be reversed and the case remanded. The parties disagree, though, on the scope of remand. The government argues that a limited remand is appropriate, citing *United States v. Paladino*, 401 F.3d 471, 483–84 (7th Cir. 2005). A *Paladino* remand involves our "retaining jurisdiction of the appeal, [while] order[ing] a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence." *Id.*

A limited *Paladino* remand is not appropriate in this case. The *Paladino* line of cases did not involve the incorrect calculation of the guidelines range. *United States v. Williams*, No. 13-1260, 2014 WL 486244, at *2 (7th Cir. Feb. 7, 2014) *(citing Paladino*, 401 F.3d at 483–85). When a district court incorrectly calculates the guideline range, we normally presume the improperly calculated guideline range influenced the judge's choice of sentence, unless he says otherwise. *See, e.g., United States v. Goodwin*, 717 F.3d 511, 520–21 (7th Cir. 2013). Accord-

ingly, we have concluded that where the error involves the incorrect guideline calculation, the *Paladino* procedure is not appropriate. *Williams*, 2014 WL 486244, at *2. Thus, in the case before us a *Paladino* limited remand is not appropriate.

But we also do not accept Adams's suggestion that we order a general remand, as defined in *United States v. Barnes*, 660 F.3d 1000, 1006 (7th Cir. 2011). In *Barnes*, "we conclude[d] that, upon a general remand for resentencing, a district court *may* permit new arguments and evidence as it deems necessary to re-fashion its sentence." *Id.* (emphasis added). We added that a "[g]eneral remand does not, however, *entitle* the defendants to present new arguments and evidence beyond that pertinent to the issues raised on appeal." *Id.* (emphasis added).

While a general remand is the typical course of action, *United States v. Simms*, 721 F.3d 850, 852 (7th Cir. 2013), in some cases it has caused unnecessary confusion and wasted judicial resources. The confusion stems, in part, from the misperception that a general remand *requires* a district court to start from scratch. It does not. *Barnes*, 660 F.3d at 1006; *Simms*, 721 F.3d at 852. Further, even with a general remand, the district court's discretion to consider new arguments is limited by "[t]wo related principles, the mandate rule and the law of the case doctrine, [which] prohibit a district court from revisiting certain issues on remand. The mandate rule requires a lower court to adhere to the commands of a higher court on remand." *United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995). For instance, where this court stated that "the sentence is Vacated, and the case is Remanded for resentencing on the issue of obstruction of justice," we held based on the mandate rule that "the only issue properly before the district court was the appropriateness of an enhancement for obstructing justice."

*Id.* at 778. "The law of the case doctrine is a corollary to the mandate rule and prohibits a lower court from reconsidering on remand an issue expressly or impliedly decided by a higher court absent certain circumstances." *Polland*, 56 F.3d at 779. Thus, the law of the case doctrine precludes a defendant from raising an argument not raised during his first appeal. *See United States v. Sumner*, 325 F.3d 884, 891 (7th Cir. 2003); *see also United States v. Whitlow*, 740 F.3d 433, 438 (7th Cir. 2014) ("In assessing the scope of our initial remand, an issue that could have been raised on appeal but was not is waived and, therefore, not remanded.").

Unfortunately, a general remand may leave the parties and the district court to sort out the parameters of mandamus and the law of the case doctrine. As a result, this court has faced several successive appeals which focused mainly on the scope of the district court's authority on remand. *See, e.g., Whitlow*, 740 F.3d at 438–40; *Simms*, 721 F.3d at 852; *United States v. White*, 406 F.3d 827 (7th Cir. 2005); *United States v. Young*, 66 F.3d 830, 835–37 (7th Cir. 1995); *Polland*, 56 F.3d at 777–79.

These cases illustrate the waste of judicial resources sometimes stemming from a general remand. And it is an unnecessary waste given that Congress has authorized appellate courts, pursuant to 28 U.S.C. § 2106,[4] to "issue

---

[4]  Section 2106 provides: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." That section applies in the sentencing context to allow us to limit remand to certain issues or order

(continued...)

general or limited remands to the district courts." *Young*, 66 F.3d at 835. But here we are speaking not of a *Paladino* jurisdiction-retaining limited remand, but of "a second type of limited remand, where the appellate court returns the case to the trial court but with instructions to make a ruling or other determination on a specific issue or issues and do nothing else." *Simms*, 721 F.3d at 852.

We find this type of limited remand appropriate here for reasons of efficiency and judicial economy because it expressly informs the parties of the scope of our remand, and thereby preempts unnecessary litigation concerning the district court's authority on remand. Accordingly, we remand Gill's case for resentencing for the limited purpose of sentencing him based on the correct guideline level of 38 and guideline range of 292 to 365 months' imprisonment.[5] This limited remand does not, however, limit the district court's discretion to hold (or not hold) further proceedings and consider further arguments to determine Gill's sentence based on the § 3553 factors. We merely limit its authority to reopen the guideline range calculation. We do so because Gill has already had one opportunity to present to the district court arguments concerning the guideline range calculation. He has already had one opportunity to challenge in this court the district court's ruling on those arguments. On appeal, Gill challenged only one ruling—the stash house enhancement. Because Gill's appeal presented no other sentencing issues, resentencing should

---

[4] (...continued)
complete resentencing. *See Young*, 66 F.3d 830, 835 (7th Cir. 1995).

[5] The two-level stash house enhancement had raised Gill's offense level to 40, which resulted in a sentence range of 360 months to life imprisonment.

similarly be limited to correcting the Ex Post Facto violation and then sentencing him based on the proper guideline range. He should not be able to "use the accident of a remand to raise in a second appeal an issue that he could just as well have raised in the first appeal because the remand did not affect it."[6] *United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996).

However, we have no way of knowing (at least based on this record) whether a different guideline range would have prompted the district court to weigh the § 3553 factors differently. Accordingly, the district court *may*, if it believes it appropriate, allow new arguments and a new hearing on the § 3553 factors. We stress, though, that this is a *may*—not a *must*. As with a general remand, the district court need not hold further proceedings or consider further argument.

One final note before closing: While we call this a limited remand, the remand is still very broad. But a court may fashion a limited remand as narrowly or broadly as it deems appropriate. *Young*, 66 F.3d at 835. It might also seem that our limited remand is no different than a general remand, given that the latter has the same limitations based on mandamus and the law of the case doctrine. In a sense that is true because we are merely stating explicitly (so as to avoid unnecessary litigation) what is implicit. *See Husband*, 312 F.3d 247, 251 (7th Cir. 2002)

---

[6] In some cases, "vacating a part of a sentence may justify or even require a new sentencing hearing. …" *See Simms*, 721 F.3d at 853. "[T]he calculus is a practical one" and sometimes a *de novo* sentencing is necessitated because "enhancements are inter-connected and the district court's original sentencing intent may be undermined by altering one portion of the calculus." *White*, 406 F.3d at 832. But this case does not present such a situation. The stash house enhancement was not interconnected with other aspects of the guideline range calculation.

(the court "may explicitly remand certain issues exclusive of all others; but the same result may also be accomplished implicitly"). In other words, our label is not important—our directive is.

### D. Bostic's Appeal

Finally, we consider Bostic's appeal. Bostic pleaded guilty without benefit of a plea agreement, but in doing so executed a written plea declaration. Bostic now claims that his guilty plea was involuntary because he was not informed that his guilty plea would preclude him from challenging the district court's earlier denial of his emergency motion to continue the trial.

At this point, a few additional background facts are needed: Bostic's trial had been set (after being rescheduled once) for February 27, 2010. On February 16, 2010, Bostic's attorneys had filed an emergency motion to continue the trial, arguing they had only recently observed that Bostic was "basically illiterate" and needed more time to ensure he understood the evidence. Bostic's attorneys also argued that they needed more time to prepare because the government recently informed them that it was obtaining Bostic's jail phone calls from the last six months and they needed a chance to review those calls. The district court denied the emergency motion to continue on the same day it was filed—February 16, 2010—and six days later, Bostic pleaded guilty to conspiracy to possess with intent to distribute heroin.

As noted above, Bostic claims on appeal that his plea was not knowing and voluntary. "A guilty plea must be both a knowing and voluntary act." *Key v. United States*, 806 F.2d 133, 136 (7th Cir. 1986). "To ensure this, Federal Rule of Criminal

Procedure 11(d) requires that the trial judge ask the defendant specific questions concerning the voluntariness of the plea agreement. This questioning creates a record that can be used in future appeals and collateral attacks," and that "record is entitled to a presumption of verity." *Id*. Not only is the record entitled to a presumption of truth, but because Bostic never sought to withdraw his guilty plea in the district court, our review is for plain error. *United States v. Davenport*, 719 F.3d 616, 618 (7th Cir. 2013).

In this case, the Rule 11 record establishes that Bostic's plea was both knowing and voluntary. During the Rule 11 colloquy, the district court asked Bostic: "Has anybody tried to force you, threaten you, or coerce you or intimidate you to get you to plead guilty?" Bostic responded "No." The court then asked: "Are you pleading guilty to this particular charge of your own free will?" And Bostic responded "Yes." The district court also inquired whether Bostic was under the influence of alcohol or drugs or suffered from any mental impairment, and Bostic indicated he had no such issues. The court also asked whether Bostic had had the opportunity to discuss the charges and the plea with his attorneys and whether Bostic had any concerns about his legal representation. Bostic told the court he had discussed the charges and his guilty plea with his attorneys and that he was satisfied with his legal representation. The district court also detailed the many rights Bostic would be giving up if he pleaded guilty and Bostic stated he understood the court's explanation.

In response, Bostic argues that his plea was involuntary because the district court did not expressly inform him that by pleading guilty he was waiving the right to appeal the denial of his motion to continue the trial date. Rule 11(b)(1) of the

Federal Rules of Criminal Procedure enumerates with specificity the rights of which a district court must inform "the defendant personally [and] in open court." *See* Fed. R. Crim. P. 11(b)(1)(A) – (O). In the case of a plea agreement, the district court must inform the defendant of "the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence." Rule 11(b)(1)(N). But in the case of a blind plea, Rule 11(b)(1) does not similarly require the district court to inform the defendant that he is waiving the right to appeal pretrial rulings. And "[w]e have previously held that the trial court is not obligated to inform defendants of the consequences of an unconditional plea on a potential appeal." *Adigun*, 703 F.3d at 1020 (*citing United States v. Fisher*, 772 F.2d 371, 375 (7th Cir. 1985)). Nonetheless, as we said in *Adigun*, it would be better for the district court to explicitly inform defendants that they are waiving the right to appeal pretrial rulings to eliminate further controversy. *Adigun*, 703 F.3d at 1020.

But even if it were error for the district court not to inform Bostic that he was waiving his right to appeal the denial of his motion for a continuance, any error would be harmless. Violations of Rule 11 are harmless if a defendant already knew the omitted information. *See United States v. Driver*, 242 F.3d 767, 769 (7th Cir. 2001). Here, the plea declaration Bostic signed stated: "Mr. Bostic further understands that he is waiving all appellate issues that might have been available if he had exercised his right to trial, and only may appeal the validity of this plea of guilty or the sentence he receives." And during the change of plea hearing, Bostic testified that he had read the entire plea declaration carefully before signing it and that when he read it he did not have any trouble understanding it.

Bostic also said he discussed the plea declaration with his attorneys and that they explained to him everything that was in the declaration. The district court also asked Bostic if he believed he understood everything in the plea declaration, to which Bostic responded: "Yes." Bostic's attorneys also stated to the court that they had read the document to Bostic "line by line, and he has been through each line with us and had them all explained to him, and we answered all his questions. So I made sure that he has had it read to him, not just that he tried to figure it out on his own." The court then asked Bostic if that was correct and Bostic said it was. Accordingly, Bostic already knew that he was waiving his right to appeal the denial of his motion for a continuance because he agreed that he was waiving all appellate issues other than ones involving his sentence or concerning the validity of his plea. Thus, any error in failing to inform Bostic that he was waiving his right to appeal would be harmless.

Bostic also argues that his plea was not knowing and voluntary because he felt he had no option but to plead guilty when the district court denied his motion for a continuance.[7] But Bostic testified under oath that he was pleading guilty of his own free will and said nothing during the Rule 11 colloquy which would indicate he felt pressured to plead guilty. Bostic's

---

[7] In making this argument, Bostic also attempts to challenge the district court's underlying denial of his motion to continue the trial date. *See* Appellant Brief at 13 ("Bostic presents one challenge to his guilty plea (which encompasses a challenge to the district court's denial of his motion to continue the trial dates).") However, because Bostic's plea was knowing and voluntary and he did not reserve the right to challenge the denial of his motion for a continuance, his blind plea precludes any challenge to the denial of his motion to continue the trial date. *Adigun*, 703 F.3d at 1018.

statements are presumed true and Bostic presents no basis for overcoming this presumption and there was no error—plain or otherwise. *See United States v. Walker*, 447 F.3d 999, 1004 (7th Cir. 2006) (rejecting the defendant's argument that the district court's denial of his motion to transfer the case to another venue rendered his decision involuntary because "he was 'anguished and distraught' by the imminent prospect of going to trial in Terre Haute"). Accordingly, his plea stands.

Bostic also challenges his sentence.[8] The district court determined that Bostic's total offense level was 42 and given his criminal history category of II, the guideline range was 360 months to life imprisonment. The district court sentenced Bostic to 456 months' imprisonment and characterized that sentence as approximately in the middle of the guideline range.

Bostic claims that in sentencing him to 456 months' imprisonment the district court committed procedural error in addressing the § 3553 factors. Specifically, Bostic argues that the district court erred when it held him responsible for some of the violence undertaken by the New Breeds gang, but without identifying which specific acts of violence the court was holding Bostic responsible for.

We reject this argument. When addressing the § 3553 factors, "although the judge must … articulate the factors that determined the sentence that he has decided to impose, his duty 'to consider' the statutory factors is not a duty to make findings." *United States v. Dean*, 414 F.3d 725, 729–30 (7th Cir. 2005). "As a general matter, the record must merely assure us

---

[8]  A blind plea of guilty does not waive a defendant's right to appeal his sentence.

that the court thoughtfully considered the statutory provis-
ions." *United States v. Nania,* 724 F.3d 824, 838 (7th Cir. 2013).
Explicit findings are required only

> to the extent necessary to fulfill two purposes: (1)
> "enabl[ing] this court to meaningfully review the
> district court's decision," *United States v. Marion,* 590
> F.3d 475, 477 (7th Cir. 2009); and (2) responding to
> the defendant's principal, nonfrivolous arguments,
> *United States v. Martinez,* 650 F.3d 667, 672 (7th Cir.
> 2011).

*Nania,* 724 F.3d at 838.

Bostic does not claim that the district court failed to
respond to a "nonfrivolous argument." The only question,
then, is whether the district court's reasoning was sufficient to
enable us to review the district court's decision. And in
answering this question, we bear in mind that with a within-
guideline sentence (which is what Bostic received), less
explanation is needed. *See United States v. Lyons*, 733 F.3d 777,
786 (7th Cir. 2013). In this case, the district court's analysis was
more than adequate to allow our review of the reasonableness
of Bostic's sentence. The district court discussed, at length, the
violence involved in the Bostic drug operation, including its
conclusion that members of the Bostic organization murdered
Devon Taylor in retaliation for an earlier shooting by a rival
gang which had wounded Bostic and killed his brother. While
the government also presented evidence at the sentencing
hearing of six or seven shootings and that Bostic had given the
green light for the shootings, the district court concluded that
"I can't say that I know that" Bostic said, "'I want you to kill
this person.'" But the court continued:

What I know is that this person [co-conspirator Davis who was involved in killing Taylor] that I think the evidence reliably shows that Mr. Bostic kept close to him. He is involved with him before and after these events. The shootings, I think it has been reliably shown that they occurred as a result of, you know, at least some of them as a result of the shooting of Mr. Bostic himself. It's absolutely true that it's possible that this just could be some person saying, hey, you know, somebody shot one of my people. I'm going to go shoot one of them. I just don't think it's particularly likely that somebody like Mr. Davis, who is involved in a drug organization like this that somebody else is in charge of, is just going to go out and do that on his own without getting some okay. I just don't have—I don't think it's a coincidence that all of these people who in one way or another worked for Mr. Bostic just happened to be involved in all of this violence that somehow relates to things that happened to him. And so, you know, I'm not sentencing Mr. Bostic on any murders. … I'm sentencing him for a narcotic offense, but I do think it's appropriate for me to take into account that what I think has been reliably shown is that Mr. Bostic was involved in an organization that used violence from time to time to accomplish whatever goals it thought was appropriate at the time. And, you know, yes, Mr. Bostic is not out there pulling any triggers, I agree with that. He's very well-insulated. He's like most CEOs. There's people that take the weight for him.

In addition to these statements, the district court found that the evidence was sufficiently reliable that Bostic "bashed in" the hand of a co-conspirator for "messing up" the money count. And that it was without question that Bostic "was the leader of a drug organization of long standing that was associated with or that was part of a street gang. And you know, violence is part of running a business like that. It's the business in the life that Mr. Bostic chose." The district court then reasoned that it did not need to make specific findings of whether Bostic committed any particular murder because there were no guideline enhancements applicable, but that it thought it appropriate:

> to take into account that nature of the business that Mr. Bostic was in charge of, the fact that he has, I think reliably been shown to have engaged in violent acts himself. And I believe that it's fair to attribute to him at least some of the violence that has been attributed to him by other people.

As these excerpts make clear, the district court considered at length the evidence before it and, while not willing to find that Bostic ordered any specific murders, concluded that it was appropriate to take into account the overall violent nature of the drug business, as well as some of the violence others had attributed to Bostic. Had Bostic argued that his sentence was unreasonable—which he did not—the district court's discussion of the § 3553 factors would be more than sufficient for us to conclude that his within-guideline sentence of 456 months' imprisonment was reasonable. Accordingly, the district court did not commit procedural error by failing to render specific factual findings concerning the violence engaged in at Bostic's behest.

Finally, Bostic challenges the district court's sentence based on the court's two-level enhancement to his guideline range for maintaining a stash house, pursuant to U.S.S.G. § 2D1.1(b)(12). But as discussed earlier, *see supra* at 14, *Peugh* holds that it is an Ex Post Facto violation to calculate a defendant's sentencing range based on a sentencing provision not in effect at the time of the commission of the offense. *Peugh,* 133 S.Ct. at 2088. Because the stash house enhancement was not in effect at the time of Bostic's offense, the district court erred in applying that enhancement. Accordingly, we remand to the district court for the limited purpose of correcting the sentencing range and resentencing Bostic based on this correct range.[9] However, and again as with Gill, this does not limit the district court's discretion to hold (or not hold) further proceedings and consider further arguments based on the § 3553 factors. We merely limit its authority to reopen the guideline range calculation.

### III.

In sum, Hunter entered a blind plea of guilty and although he unilaterally stated that he was preserving the right to appeal the denial of his motion to suppress Title III wire-tap materials, the government did not acquiesce to the entering of a conditional guilty plea. Nor did the district court approve such a plea. Accordingly, Hunter cannot now appeal the denial of his motion to suppress. Next, Adams's appeal fails because the

---

[9] The government argued that, unlike Gill, Bostic had waived the Ex Post Facto clause argument by not adequately presenting it to the district court. However, even if the argument had been waived, there would be plain error and remand would be appropriate. *See Williams,* 2014 WL 486244, at *2.

district court did not commit clear error in holding him responsible for the drugs sales made by other street-level sellers working alongside Adams. Conversely, Gill and Bostic both succeed in their Ex Post Facto challenges to the two-level stash house enhancements they received, and we remand their cases for the limited purpose of resentencing them based on the corrected guideline range. Bostic, though, has not established plain error in his current claim that his plea was not knowing and voluntary. Bostic's claim that the district court erred in not identifying the specific instances of violence for which it found him responsible also fails because the court considered the § 3553 factors sufficiently for our review. For these and the foregoing reasons, we DISMISS in part, AFFIRM in part, and REVERSE and REMAND, in part.

POSNER, *Circuit Judge*, concurring and dissenting. I join Judge Manion's opinion with respect to all the appellants except Adams. He is entitled, I am persuaded, to be resentenced. Application Note 2(c)(6) to section 1B1.3 of the sentencing guidelines is dispositive:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, pools his resources and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.

Adams is P, not Q, because he doesn't pool his resources and profits with any other street-level dealer. He "knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells" and "share[s] a common source of supply [with them], but otherwise operate[s] independently." Because Adams is P, he is "not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a *jointly undertaken criminal activity* with them." I emphasize "jointly undertaken criminal activity" to make clear that it would not be enough that they were co-conspirators of his to justify a sentence

based on the quantity of drugs sold by the other dealers: "Conspiracy liability, as defined in *Pinkerton v. United States,* 328 U.S. 640, 646–48 (1946), is generally much broader than jointly undertaken criminal activity under § 1B1.3." *United States v. Soto-Piedra,* 525 F.3d 527, 531 (7th Cir. 2008).

The majority opinion deems Adams distinguishable from P because P competes with the other street-level dealers and Adams did not. But the application note doesn't say that P competes with other dealers. Nor are competitors necessarily less likely to engage in joint undertakings than cooperators; competitors may decide to collude, and thus become coop- erators. In any event there is no evidence that Adams did *not* compete with other street-level dealers who bought from Bostic's gang. The government says that, unlike P, Adams "worked for (and benefitted from) Bagley," his contact man in the gang. But that is just to say that Adams and the other street-level vendors had a common source of supply, namely the same member of the Bostic gang.

The government and the majority opinion confuse a ver- tical agreement—P's agreement, which the application note tells us does not create a joint criminal undertaking—with a horizontal agreement, which does. Adams agreed to distrib- ute heroin for the Bostic gang at a specified location and to remit the proceeds of his sales to Bagley, a supervisory em- ployee of Bostic. In exchange he received a cut of those pro- ceeds. He thus was a commissioned salesman. Of course he knew that the gang marketed heroin through other street- level vendors in his neighborhood, and of course he knew what they did for the gang—the same thing he did. But he did not work with or help them. At oral argument the gov- ernment's lawyer said that the dealers looked out for each

other, for example by warning each other when police appeared. But he acknowledged that no evidence was presented at Adams's sentencing hearing that *Adams* did, or had agreed to do, any of that "looking out."

The district judge based his attribution to Adams of the heroin sold by the other dealers on Adams's "understanding at some level that other people are doing the same thing and you're all part of the same overall group … . I think that is sufficient to constitute knowledge and awareness of a jointly undertaken criminal activity … . What you have to know is that you're part of an activity that is being done in concert with them. And even if you're both at the bottom end … of the organizational chart, if you understand that there's a chart that goes up to the same apex and it's all the same organization, I think that is sufficient." The judge was confusing knowledge of what other people are doing with agreeing with other people to do something. Adams knew that Bostic had other street-level vendors; but he had no agreement with them. Suppose a McDonald's franchisee in Chicago is bulking out his hamburgers with horse meat. Another McDonald's franchisee, this one in Peoria, learns what the Chicago franchisee is doing, thinks it's a clever way of cheating customers, and starts doing it himself. In merely acting upon knowledge of what someone in the same franchise organization is doing, he is not a co-conspirator of that someone even if he buys his horse meat from the same vendor.

The government labors under the same misconception concerning the meaning of conspiracy as the district judge did when it tells us in its brief that "at the end of his shift, Adams met Bagley to turn in his proceeds, just like the other street sellers in the Bostic Organization. And as he admitted,

Adams knew that the money that those street sellers earned was returned to Bagley … . This evidence proved that Adams joined this criminal scheme in concert with others. … Adams did not simply sell heroin in the same geographic area in which others sold heroin. He knowingly sold the Bostic Organization's heroin in the Bostic drug territory alongside other street-sellers who likewise worked for the Bostic Organization. … Moreover, Adams knew that he and other street sellers worked for Bagley … . The conduct of those other street-sellers was therefore foreseeable to Adams." The majority opinion echoes this when it remarks that "Adams does not claim that the sales of the other sellers were not foreseeable to him." If you sell raspberries in Treasure Island, you can foresee that raspberries are also being sold in Whole Foods.

What the government asserts and the majority opinion echoes is all about knowledge, and just about knowledge. It is not about cooperation. It is no different from our hypothetical McDonald's case. It flouts unequivocal statements in cases such as *United States v. Salem*, 597 F.3d 877, 889 (7th Cir. 2010), that awareness of criminal activity doesn't make that activity "jointly undertaken." See also *United States v. Soto-Piedra, supra*, 525 F.3d at 531; *United States v. Reese*, 67 F.3d 902, 909 (11th Cir. 1995).

The majority opinion invokes Application Note 2(c)(8), like 2(c)(6) an attempt by means of example to explain what "jointly undertaken criminal activity" is. 2(c)(8) reads as follows (the deleted material, indicated by the ellipses, consists merely of citations to subsections of the guidelines):

> Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from

Mexico into the United States. Defendants T, U, V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana … and aided and abetted each other's actions … in carrying out the jointly undertaken criminal activity. In contrast, if Defendants T, U, V, and W were hired individually, transported their individual shipments at different times, and otherwise operated independently, each defendant would be accountable only for the quantity of marihuana he personally transported … . As this example illustrates, in cases involving contraband (including controlled substances), the scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.

The majority opinion quotes only the last sentence, thus missing the distinction between the two examples involving the four offenders. In the first example the four dealers "coordinate their importation efforts … for mutual assistance and protection" and thus are "engaged in a jointly undertaken criminal activity." In the second example the four "were hired individually, transported their individual shipments at different times, and otherwise operated independently," and so "each defendant would be accountable only for the quan-

tity of marihuana he personally transported." That is Adams.

The majority opinion relies on *United States v. Smith*, 13 F.3d 860 (5th Cir. 1994), a case in which four crack dealers shared a house which they used as "a very rudimentary shopping center or flea market for crack"; these "friendly competitors" had "created a marketing site greater than the sum of its parts," producing "a marketing symbiosis that far outweighed its minor competitive aspect." *Id*. at 865. Although the four were joint occupants of a crack house—a more intimate relation than that between Adams and the other sellers of drugs supplied by Bostic—Smith stood out from the other crack dealers and was the only one whose sentence was increased in recognition of the existence of a jointly undertaken criminal activity. Adams is no Smith.

Yet the majority opinion regards the present case as a stronger one for the government than *Smith* was, because "Adams and the other sellers working the morning shift in Bostic's open-air drug market did not own the drugs," which "shows that Adams had much less independence than the dealers in *Smith*." Earlier the majority opinion had stated that Adams was "selling heroin owned by [the Bostic] organization" rather than owned by himself. I don't think that distinction has the slightest relevance. Remember that the question is whether Adams is P or Q in Application Note 2(c)(6). The note doesn't mention ownership. Nor is ownership a *sine qua non* of competition, emphasized by the majority opinion (mistakenly as I suggested) as the key to distinguishing Adams from P. Often competition is between owners, but often it is not, as in the case of retail salesmen who work on commission. If you go to buy a pair of shoes,

the salesmen you encounter will not own the shoes they're trying to sell but they may well be in competition with each other for commissions. Or think of a bookstore: what difference does it make whether the store buys books from publishers and resells them, or sells them as the publishers' agent and so title passes from the publisher to the store's customer when the customer buys a book?

When one is dealing with illegal activity, moreover, distinctions between owner and agent, sale and consignment, are usually blurred and generally irrelevant. Why should Adams's sentence depend to the slightest degree on whether title to the drugs did or did not pass to him? The majority opinion states that Adams had less "independence" than the defendants in the *Smith* case by virtue of not owning the drugs he sold. But his dependence was on the Bostic supervisor who furnished him the drugs to sell on a consignment basis, not on the other dealers, which would be the dependence (suggesting they were jointly dealing drugs) relevant to Application Note 2(c)(6).

The sentencing error made by the district judge and condoned in the majority opinion is not trivial. The inclusion of sales of heroin by the other dealers increased Adams's sentencing range from 188–235 months to 262–327 months and his statutory minimum sentence from 5 years to 10. The judge sentenced him to 180 months, dipping well below the guidelines range because he thought its bottom, 262 months, "way excessive." A reduction in the guidelines range might prompt him to reduce the sentence further, though because this is not certain a limited remand would be appropriate to enable him to reconsider the sentence.